222 F.Supp.2d 312 (2002)
In re STERLING FOSTER & CO., INC. SECURITIES LITIGATION.
Robert Levitt for himself and as custodian for Richard Levitt and Monica Levitt, Robert Rice, Stephen G. Siben, Stephen Stobehn, Stanley Veltkamp, Philip C. Vitanza for himself and Elizabeth Vitanza and Luke Vitanza, John T. White, Guy V. Wood, Carl Zander, Jr., and Ted M. and Kathryn N. Jones, as Trustees, Plaintiffs,
v.
Bear Stearns & Co., Inc., and Bear Stearns Securities Corp., Defendants.
No. 99 CV 2789(ADS)(MLO), MDL Docket No. 1208 (ADS)(MLO).
United States District Court, E.D. New York.
June 27, 2002.
*313 Morley and Trager, Leslie Trager, Esq. Of Counsel, New York, NY, for the Plaintiffs.
Arnold & Porter, Peter L. Zimroth, Esq., Kerry A. Dziubek, Esq., of Counsel, New York, NY, Stephen M. Sacks, Esq., Scott B. Schreiber, Esq., James L. Cooper, Esq., of Counsel, Washington, DC, for the Defendants.

MEMORANDUM OF DECISION AND ORDER
SPATT, District Judge.
On February 16, 1999, the plaintiffs filed a complaint alleging that Bear Stearns & Co., Inc. and Bear Stearns Securities Corp. ("BSSC"), (collectively, "Bear Stearns" or the "defendants") violated Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), by participating in a scheme with Sterling Foster & Co., Inc. ("Sterling Foster") to manipulate the market for ML Direct, Inc. ("ML Direct") securities during and after the company's initial public offering ("IPO"). Presently before the Court is a motion by the defendants to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.").

I. BACKGROUND

A. The Procedural Nature of the Case
This case is one of eleven that comprise the Multidistrict Litigation known as In re Sterling Foster Sec. Litig., MDL No. 1208. In an order dated February 18, 1998, the Judicial Panel on Multidistrict Litigation ("J.P.M.L.") granted a motion by Sterling Foster to centralize nine actions that had been brought against the company in various district courts throughout the country. The J.P.M.L. transferred the actions to the Eastern District of New York and assigned the Multidistrict Litigation to this Court for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.
On February 16, 1999, the plaintiffs commenced the present action by filing the complaint in the Southern District of New York. On April 22, 1999, the J.P.M.L. transferred the case to this Court as a "tag-along" to the Multidistrict Litigation. The present decision is issued simultaneously with decisions in other cases that are part of the Multidistrict Litigation: Rogers, et al. v. Sterling Foster & Co., Inc. 97 CV 189 (consolidated with, Civil Action Nos. 97 CV 610, 97 CV 1689, 97 CV 3253, and 97 CV 3775); Price v. Sterling Foster & Co., et al., 97 CV 1470; Umbriac v. Sterling Foster & Co., et al., 98 CV 1469; Mott v. Sterling Foster, et al., 98 CV 1471; Farida v. Sterling Foster & Co., et al., 98 CV 2290; and Braymen, et al. v. Sterling Foster & Co., et al., 98 CV 2291.

B. The Complaint
The following facts are taken from the complaint and are accepted as true for the purpose of deciding the present Rule 12(b)(6) motion. See Koppel v. 4987 Corp., 167 F.3d 125, 127 (2d Cir.1999); Thomas v. City of New York, 143 F.3d 31, 36 (2d Cir.1998). The claims in this case arise *314 out of the ML Direct IPO, which was underwritten by Patterson Travis, Inc. ("Patterson Travis"). The putative plaintiff class consists of individuals who purchased ML Direct common stock through Sterling Foster, during the period September 4, 1996 through December 31, 1996 (the "class period").
The registration statement for the IPO states that approximately 1.1 million shares of common stock would be issued to the public in the offering. The registration statement explains that the shares would be issued in units consisting of two shares of common stock and one common stock purchase warrant. The issue was priced at $15 per unit. Therefore, the price per share at the offering was approximately $7.50.
The registration statement also discloses that certain company insiders ("Selling Securityholders") owned 2.4 million shares of ML Direct common stock at the time of the offering. The Selling Securityholders agreed not to sell their shares for the 12 months following the offering unless they received permission to do so from Patterson Travis. These "lock-up agreements" were specifically mentioned in the ML Direct registration statement and prospectus:
The securities held by the Selling Securityholders may be sold commencing 12 months from the date of this Prospectus, subject to earlier release at the sole discretion of Patterson Travis, Inc., [which] has no agreements or understandings with any of the Selling Securityholders with respect to release of the securities prior to the respective periods and has no present intention of releasing any or all of such securities prior to such periods.
(complaint ¶ 17).
The complaint further alleges that, despite the representations regarding the lock-up agreements, Sterling Foster and the Selling Securityholders entered into a secret agreement by which Sterling Foster would purchase the Selling Securityholders' shares after the offering at $3.25 per share in order to cover a short position Sterling Foster intended to establish in the aftermarket. The fact and nature of the agreements between Sterling Foster and the Selling Securityholders were not disclosed in the registration statement.
The registration statement became effective on September 3, 1996, and trading began the following day. On September 4, 1996, Sterling Foster purchased the majority of ML Direct shares, causing the price of the stock to rise to $15.25 per share by the close of trading that day.
On September 4 and 5, 1996, Sterling Foster sold over 3.375 million shares of ML Direct to the investing public at approximately $14 to $15 per share, thus establishing a short position that exceeded the total amount of shares available in the entire market by approximately 2.3 million shares. Sterling Foster was required to deliver the shares to Bear Stearns, its clearing broker, by September 9, 1996, in order to cover its short by the settlement date for trades executed on September 4, 1996. However, Sterling Foster failed to deliver the shares by that date. In fact, on September 9, 1996, Sterling Foster would have been unable to cover its short position of 3.375 million shares because the market for ML Direct common stock only consisted of 1.1 million shares.
Nevertheless, Sterling Foster eventually did cover its short position with the Selling Securityholders' shares. On September 10, 1996, Patterson Travis released the Selling Securityholders from their lock-up agreements, and Sterling Foster purchased their shares at $3.25 per share. Sterling Foster delivered these shares to Bear Stearns on September 11 and 12, 1996, thereby covering its short position. *315 The difference between selling the shares to the public at $14 to $15 per share and purchasing those shares at $3.25 per share enabled Sterling Foster to realize a profit of $24,000,000.
The plaintiffs claim this market manipulation scheme led the public to believe that 1.1 million shares of ML Direct were being offered to the public, and that the market set the price of $13 to $15 per share. However, 3.375 million shares were being offered to the public at prices artificially inflated by Sterling Foster's massive purchases in the immediate aftermarket.
The plaintiffs allege that Bear Stearns knew about the scheme to manipulate the market for ML Direct securities prior to the effective date of the registration statement. The plaintiffs also contend that Bear Stearns participated in the scheme. Before agreeing to clear trades for an introducing broker, such as Sterling Foster, Bear Stearns required the introducing broker to seek permission from Bear Stearns to act as an underwriter before it would clear the broker's trades. In accordance with this policy, on August 20, 1996, Sterling Foster asked Bear Stearns for permission to act as the underwriter for the sale of the 2.4 million shares of ML Direct common stock owned by the Selling Securityholders.
At the time of Sterling Foster's request, officers at Bear Stearns knew that Sterling Foster intended to take a substantial short position of ML Direct in its Bear Stearns trading account shortly after the effective date of the registration statement. Bear Stearns' officers also knew that Sterling Foster would not cover its short position by the settlement date but would cover it later from shares Sterling Foster purchased from the Selling Securityholders. Because Bear Stearns knew that Sterling Foster intended to establish a substantial short position in the immediate aftermarket and cover that position with the Selling Securityholders' shares, Bear Stearns also knew that the descriptions of the lock-up agreements contained in the prospectus, which Bear Stearns received on August 2, 1996, were false.
Bear Stearns gave Sterling Foster permission to underwrite the sale of the Selling Securityholders' shares and agreed to clear the trades provided that Sterling Foster deposit an additional $3,000,000 with Bear Stearns and that Adam Lieberman ("Lieberman"), Sterling Foster's president, give a personal guarantee for any losses Bear Stearns might incur during the ML Direct underwriting. Lieberman signed the guarantee on or about August 20, 1996.
The complaint alleges that on or before September 12, 1996, Bear Stearns knew that Sterling Foster was realizing a 400% profit on its short sales and subsequent coverage from the Selling Securityholders' shares. On September 4, 1996, at 8:30 a.m., Richard Harriton, the president of Bear Stearns Securities Corp. received an email regarding Bear Stearns' credit risk with respect to Sterling Foster. Then, on September 5, 1996, when Sterling Foster's trading account was short approximately 2.3 million shares, Bear Stearns extended credit to Sterling Foster. In addition, when Sterling Foster failed to cover its short position by delivering the shares on September 9, 1996, Bear Stearns became an unsecured creditor of Sterling Foster for more than $23 million. Further, the money Sterling Foster owed to the Selling Securityholders for the purchase of their shares was paid by Bear Stearns from Sterling Foster's trading account even though Bear Stearns had not received the shares from Sterling Foster. Bear Stearns officers received documents stating the number of shares it would receive from the Selling Securityholders and the price to be paid for those shares.
*316 Bear Stearns sent purchasers of ML Direct confirmations which stated, "Your broker makes a market in this security, and acted as principal." The plaintiffs contend that these statements are false because they imply that the plaintiffs' purchases were market transactions, when, as Bear Stearns knew, the plaintiffs bought the stock at a Sterling Foster underwriting from which Sterling Foster made a 400% profit. Bear Stearns profited as a result of its participating in the fraud because it received $23 for each trade of ML Direct by Sterling Foster.
The plaintiffs contend that Bear Stearns fraudulently concealed its role in the scheme to manipulate the market for ML Direct Securities. Bear Stearns denied knowledge of Sterling Foster's fraud and market manipulation. However, in September 1998, a former Bear Stearns officer admitted that on or before September 12, 1996, Bear Stearns knew that Sterling Foster was making a 400% profit by establishing a large short position and covering that position with shares purchased from the Selling Securityholders.
The complaint raises three claims against Bear Stearns. The first claim alleges that Bear Stearns violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) by participating in the scheme to manipulate the market for ML Direct Securities. The second claim also alleges a Section 10(b) violation but is based on the allegedly false statements Bear Stearns made in the confirmation sent to purchasers of ML Direct between September 4, 1996 and September 13, 1996. The third claim alleges that Bear Stearns violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) in that it controlled Sterling Foster because it could have refused to clear Sterling Foster's trades. The fourth claim alleges common law fraud.

II. DISCUSSION

As noted, the defendants move to dismiss the complaint pursuant to Rule 12(b)(6) of the Fed.R.Civ.P. On a motion to dismiss for failure to state a claim, the Court should dismiss the complaint pursuant to Rule 12(b)(6) if it appears beyond doubt that the plaintiff can prove no set of facts in support of his complaint which would entitle her to relief. See King v. Simpson, 189 F.3d 284, 286 (2d Cir.1999); Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir.1996); I. Meyer Pincus & Assocs. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir.1991) (holding that dismissal is inappropriate unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations"). The issue to consider is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. See Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir.1995). Indeed, it is not the Court's function to weigh the evidence that might be presented at trial; instead, the Court must merely determine whether the complaint itself is legally sufficient. See Villager Pond, 56 F.3d at 378. The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. See Koppel v. 4987 Corp., 167 F.3d 125, 127 (2d Cir.1999); Thomas v. City of New York, 143 F.3d 31, 36 (2d Cir.1998).
In making this determination, the Court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Leonard F. v. Israel Discount Bank of N.Y., 199 F.3d 99, 107 (2d Cir.1999); see Rothman v. Gregor, 220 F.3d 81, 89 (2d Cir.2000) (holding that for the purpose of deciding a motion to dismiss, *317 the complaint includes "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference"); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir.1999). The Court also may consider documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit. Rothman, 220 F.3d at 97; Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42, 47-48 (2d Cir.1991). Further, in securities fraud actions, the Court may consider "public disclosure documents required by law to be and which actually have been filed with the SEC." Rothman, 220 F.3d at 89 (citing Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991)); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 808-09 (2d Cir.1996).

A. The Statute of Limitations
The first ground upon which the defendants' motion to dismiss is based is that the plaintiffs have failed to comply with the one-year statute of limitations. The defendants argue that the plaintiffs had actual or constructive notice of the fraud allegedly perpetrated by Bear Stearns in May 1997 because on February 14, 1997, the Securities and Exchange Commission ("SEC") filed a complaint against Sterling Foster, see SEC v. Sterling Foster & Co., Inc. et al., No. 97 Civ. 1077 (S.D.N.Y.1997), and on May 13, 1997, Howard Greenberg ("Greenberg") filed a statement of claim in an National Association of Securities Dealers' ("NASD") arbitration, see Matter of Greenberg v. Bear Stearns & Co., Inc., Bear Stearns Securities Corp., NASD Case No. 97-02465 (S.D.N.Y.1997), upon which the present complaint is based. The defendants' claim that the plaintiffs' failure to file their complaint within one year of this notice renders their claim time-barred.
On the other hand, the plaintiffs contend that they did not receive notice in May 1997 because, at that point, it appeared that Bear Stearns was merely a clearing broker with no connection to Sterling Foster's fraud. The plaintiffs argue that they did not receive notice of Bear Stearns' involvement until September 1998, when a Bear Stearns officer, testifying in the arbitration, admitted Bear Stearns' knowledge of the scheme. According to the plaintiffs, the facts pleaded in the arbitration would not have been sufficient to withstand a Rule 12(b)(6) challenge in federal court, and thus, the arbitration does not show that an ordinary investor would suspect Bear Stearns to have prior knowledge of the fraudulent scheme.
Claims under Section 10(b) must be brought both within one year of the discovery of the facts underlying the alleged violation, and within three years of the alleged violation. See 15 U.S.C. § 78i(e); Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). For the purpose of this statute of limitations, discovery of facts "includes constructive or inquiry notice, as well as actual notice." Menowitz v. Brown, 991 F.2d 36, 41-42 (2d Cir.1993); see Rothman, 220 F.3d at 96; Dodds v. Cigna Securities, Inc., 12 F.3d 346, 350 (2d Cir.1993). Thus, "[a] plaintiff in a federal securities case will be deemed to have discovered the fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." Dodds, 12 F.3d at 350. A potential plaintiff is deemed to have received inquiry notice "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." Dodds, 12 F.3d at 350. The information giving rise to inquiry notice includes "any financial, legal or other data available to the plaintiffs providing them with sufficient storm *318 warnings to alert a reasonable person to the [probability] that there were either misleading statements or significant omissions involved in the sale of the [securities]." In re Integrated Resources Real Estate Litig., 815 F.Supp. 620, 638 (S.D.N.Y.1993). When the potential plaintiff receives these "storm warnings," a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." Dodds, 12 F.3d at 350.
After "storm warnings" appear, plaintiffs must exhibit reasonable diligence investigating the probability that they have been defrauded. Rothman, 220 F.3d at 97; Dodds, 12 F.3d at 350; De La Fuente v. DCI Telecommunications, Inc., No. 01 Civ. 3365 (CM), 2002 WL 664056 (S.D.N.Y. Apr.23, 2002). A plaintiff who is on inquiry notice and who fails to exercise reasonable care and diligence in seeking to uncover the facts underlying the fraud "will be charged with notice of such facts as a diligent inquiry would have disclosed." CSI Inv. Partners II, L.P. v. Cendant Corp., 180 F.Supp.2d 444, 457 (S.D.N.Y. 2001); Rothman, 220 F.3d at 96; Dodds, 12 F.3d at 350.
It is important to note that the date of "discovery" that commences the statute of limitations in a case where the plaintiff has received "inquiry notice" is not the date that the duty of inquiry arises. See Rothman, 220 F.3d at 97. Rather, the date of discovery is the date that the plaintiff, having obtained inquiry notice, "in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." Rothman, 220 F.3d at 97. In Rothman, 220 F.3d at 81, the Second Circuit was careful to distinguish the date a plaintiff receives inquiry notice from the date on which the statute of limitations commences. There, the Court reiterated its holding in Dodds, 12 F.3d at 350, stating, "`A plaintiff in a federal securities case will be deemed to have discovered fraud for the purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud.'" Rothman, 220 F.3d at 97 (quoting Dodds, 12 F.3d at 350) (emphasis in original).
The Court of Appeals also reviewed a Tenth Circuit opinion in which that Court held that inquiry notice "triggers an investor's duty to exercise reasonable diligence," but the limitations period does not begin to run until "the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the fraud." Sterlin v. Biomune Systems, 154 F.3d 1191, 1201 (10th Cir.1998). The Second Circuit concluded that in accordance with its own precedent and with Sterlin, whether a federal securities claim is time-barred turns on "when, after obtaining inquiry notice ... the [plaintiffs] in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." Rothman, 220 F.3d at 97.
Applying these standards to the facts of this case, the Court finds that the plaintiffs' claims against Bear Stearns are time-barred. Accepting the allegations in the complaint as true, see Koppel, 167 F.3d at 127; Thomas, 143 F.3d at 36, the plaintiffs received actual notice of Bear Stearns' alleged involvement in the fraudulent scheme in September 1998, when, during the Greenberg arbitration, a former Bear Stearns officer admitted that on or before September 12, 1996, Bear Stearns knew that Sterling Foster was making a 400% profit by establishing a large short position and covering that position with shares purchased from the Selling Securityholders. However, the commencement of the statute of limitations for Section 10(b) claims is not restricted to the date a potential plaintiff receives actual notice of the fraud, *319 see Menowitz, 991 F.2d at 41-42 (holding that the statute of limitations in a securities fraud case runs from the date of the discovery of the facts underlying the alleged violation, and discovery includes inquiry and actual notice); it also includes the date on which a "reasonable investor of ordinary intelligence would have discovered the existence of the fraud." Dodds, 12 F.3d at 350; see Rothman, 220 F.3d at 96; Menowitz, 991 F.2d at 41-42. Thus, the question presently before this Court is whether the plaintiffs received inquiry notice prior to the September 1998 admission of the Bear Stearns officer.
The Court finds that the financial and legal data, together with the attention the press paid to Sterling Foster's allegedly fraudulent conduct provided sufficient storm warnings to alert a reasonable person in May 1997 to the probability that he had been defrauded. See In re Integrated Resources, 815 F.Supp. at 638. The financial data available to the plaintiffs is the simple fact of their financial loss. The plaintiffs in this case claim to have suffered losses ranging from $4,652.62 to $143,960.95. Certainly, a reasonable investor who suffered financial losses such as these would be curious as to the reasons for their losses.
Next, in late 1996 and early 1997, several entities filed charges, cases, and claims against Sterling Foster alleging securities fraud in connection with several IPOs. On February 26, 1996, Farid Farida, a/k/a Fred Farida, filed the first private action against Sterling Foster in the Eastern District of Michigan, see Farida v. Sterling Foster & Co., Inc., et al., (E.D. Mich. 96 CV 70843, E.D.N.Y. 98 CV 2290). On October 8, 1996, the NASD filed a disciplinary action against Sterling Foster and 15 of its employees or principals accusing them of making $53 million in illicit profits from improper IPOs and boiler-room sales practices. Approximately four months later, on February 14, 1997, the SEC commenced a civil enforcement action against Sterling Foster, see SEC v. Sterling Foster & Co., Inc., et al. (S.D.N.Y. 97 CV 1077). Many of the cases that comprise the Multidistrict Litigation also were commenced before May 30, 1997: Rogers, et al. v. Sterling Foster & Co., Inc. et al., 97 CV 189, was filed on January 15, 1997; Smith v. Sterling Foster & Co., Inc., et al., 97 CV 610, was filed on February 6, 1997; Wright v. Sterling Foster & Co., Inc. et al., 97 CV 1689, was filed on April 7, 1997; Reynoso v. Sterling Foster & Co., Inc. et al., 97 CV 3253, was filed on May 9, 1997; and Mott v. Sterling Foster & Co., Inc. et al., 98 CV 1471, was filed in the District of South Carolina (97 CV 1082) on April 21, 1997. In addition, on May 13, 1997, Howard Greenberg commenced an NASD arbitration against Bear Stearns & Co., and BSSC by filing a Statement of Claim, see Matter of Greenberg v. Bear Stearns & Co., Inc., and Bear Stearns Securities Corp.
The Court can consider the Greenberg Statement of Claim and the SEC complaint because the plaintiffs specifically relied on the filings in these cases in bringing this action. See Rothman, 220 F.3d at 89; Cortec Indus., 949 F.2d at 47-48. Furthermore, the Court may take judicial notice of all these complaints and claims as public documents. See Rothman, 220 F.3d at 92; Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir.1991). Obviously, the Court does not consider these documents for the truth of the matters asserted but, rather, to establish the fact of the litigations and filings. See Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc., 969 F.2d 1384, 1388 (2d Cir.1992).
In addition, Sterling Foster's alleged fraudulent conduct did not go unnoticed by the press. Reports about the NASD complaint, the SEC charges, an alleged FBI *320 raid of Sterling Foster's offices, and articles warning the public about "pennystock" scams such as the one allegedly perpetrated by Sterling Foster appeared in newspapers around the country. See Brett D. Fromson, NASD Unit Alleges Firm Violated Law; Fraud Case is Biggest Brought by Group, The Washington Post, Oct. 9, 1996, B11 ("The enforcement division of the National Association of Securities Dealers yesterday accused a NASD market-maker, Sterling Foster & Co. of Melville, N.Y. of defrauding customers of $53 million in three initial public offerings in 1995."); NASD Hits LI Securities Firm With Fraud Charges, Newsday, Oct. 9, 1996, A49 ("A Long Island securities firm yesterday was charged by regulators with netting $53 million in illegal profits by manipulating the prices of new public company stocks in the NASDAQ SmallCap Market."); NASD Accuses Market Maker of Fraud in 3 Public Offerings, The Seattle Times, Oct. 9, 1996, D3 (describing NASD accusations); Charges Laid in NASDAQ Trading, The Financial Post, Oct. 9, 1996 (same); Leslie Eaton, NASD Panel Says Broker Manipulated Stock Trading, N.Y. Times, Oct. 9, 1996, D5 (same); Business Section, The Commercial Appeal (Memphis, TN), Oct. 9, 1996 (same); Business Section, Buffalo News, Oct. 9, 1996 (same); Business Briefcase, Boston Herald, Oct. 9, 1996 (same); Deborah Lohse, Sterling Foster Charged by NASD for Illicit Trading, The Wall Street Journal, Oct. 9, 1996, A15 (same); Susan Harrington, NASD Targets Fraud in Small Cap Trading, Newsday, Oct. 10, 1996, A55 (same); NASD Cracks Down, Pittsburgh Post Gazette, Oct. 10, 1996, C11 (same); Broker Sterling Foster is Cited by NASD for Illicit Profits, The Asian Wall Street Journal, Oct. 10, 1996 (same); Andy Zisper, Zapping the Bad Guys, Barron's, Oct. 14, 1996 (same); Dan Beucke, Week In Business, Newsday, Oct. 13, 1996 (same); Michael Siconolfi and Deborah Lohse, Expensive Lesson, Inside a Dubious IPO: Sponsor, It Appears Held All the Cards; Investors Lost Millions Buying Stock that NASD Says Underwriter Had Rigged; Stuck With Wooden Tickets, The Wall Street Journal, Nov. 5, 1996 (describing allegations in detail); Susan Harrigan, Small Stocks, Greater Frauds and Avoiding a Broker With a Bent for Bilking, Newsday, Nov. 17, 1996, F08 (same); Lost Voice: Overviews and Undercurrents, Computer Business Review, Dec. 1, 1996 (describing the allegations against Sterling Foster in regard to the IPO in Advanced Voice Technologies); Confidence in Advanced Voice Technologies Falls After Scandal, Computergram Int'l, Jan. 7, 1997 (explaining the charges against Sterling Foster in regard to the IPO in Advanced Voice Technologies and stating that "confidence in the company seems to have fallen" since the NASD charges were made public); Robert E. Kessler, Brokerage Firm Raided by FBI, Newsday, Feb. 14, 1997, A53 ("Four dozen federal agents raided a Melville brokerage firm yesterday, searching for evidence that customers were bilked of tens of millions of dollars through the illegal manipulation of new stock offerings."); Financial Section, Chicago Sun Times, Feb. 14, 1997 (describing a raid by the FBI and postal inspectors of Sterling Foster's offices); Sterling Foster & Co: Brokerage Firm is Searched by FBI, U.S. Postal Service, Feb. 14, 1997, A4 (same); Business Section: Short Cuts, Newsday, Feb. 15, 1997, A25 ("The Securities and Exchange Commission sued Sterling Foster & Co. and four of the Melville-based brokerage employees, alleging they garnered $75 million in profits by manipulating the stock of six public companies."); Jay Matthews, SEC Accuses Brokerage of Stock Pricing Fraud; Sterling Foster Allegedly Took $75 Million, The Washington Post, Feb. 19, 1997, D13 (describing lawsuit filed by the *321 SEC); SEC Sues Brokerage, The Milwaukee Journal Sentinel, Feb. 15, 1997 (same); SEC to Allow Earlier Stocks Resale, Los Angeles Times, Feb. 19, 1997 (same); Michael Siconolfi, Wall Street Lawyer Evolves From Foe to Friend of Penny-Stock Broker Firms, The Wall Street Journal, March 5, 1997, C1 (describing the role played by a lawyer in Sterling Foster's alleged conduct and mentioning the SEC lawsuit); Grand Jury Probes LI Brokers, Newsday, May 1, 1997 A61 (stating that criminal investigation of Sterling Foster's affairs had begun; Sterling Foster was operating with a greatly reduced sales force; Sterling Foster was being overseen by a court-appointed monitor; and Sterling Foster was now only liquidating customer accounts); Crackdown Hits Brokers Who Sell Stocks Over the Phone, Orlando Sentinel, May 30, 1997, B5 (describing high-pressure sales tactics used by brokers at, among other places, Sterling Foster and explaining new measures to prevent this conduct); 20 States Target Telephone Stock Sellers, Crain's New York Business, May 30, 1997, C03 (same); Susan Harrigan, Crackdown on Penny-Stock Firms, Newsday, May 30, 1997, A65 (same); Beth Healy, On State Street: Securities Regulators Warn of Investor Scams, Boston Herald, May 30, 1997 (same).
The Court takes judicial notices of the articles listed above only to show the widespread media attention Sterling Foster's alleged conduct received. See generally Ganino v. Citizens Utilities Co., 228 F.3d 154, 166-67 (2d Cir.2000) (district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment); Jewell v. NYP Holdings, Inc., 23 F.Supp.2d 348, 378-79 (S.D.N.Y.1998) (taking judicial notice of the fact that "everyone hoped that the individual(s) responsible for the crime would be quickly brought to justice"); Schwenk v. Kavanaugh, 4 F.Supp.2d 116, 118 (N.D.N.Y.1998) (taking judicial notice of the fact that a particular article appeared on the front page of the New York Law Journal); Cerasani v. Sony Corp., 991 F.Supp. 343, 354 n. 3 (S.D.N.Y.1998) (taking judicial notice of the widespread newspaper coverage of the trial); Comas v. Merrill Lynch & Co., No. 92 Civ. 6560 (KC), 1993 WL 800778, at *4 n. 2 (S.D.N.Y. July 2, 1993) (taking judicial notice of the fact that stock prices were listed daily in the Wall Street Journal); Korwek v. Hunt, 646 F.Supp. 953, 958-59 (S.D.N.Y.1986) (taking judicial notice that "regular newspaper readers knew what this case was about"), aff'd 827 F.2d 874 (2d Cir.1987).
The Court takes judicial notice only of the fact that these articles were published, not of the truth of their contents. See generally, Kramer, 937 F.2d at 774 (finding that courts routinely take judicial notice of public documents not for the truth of the matters asserted but to establish the fact of the litigation). Moreover, the fact that these articles were published is "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned." Fed.R.Evid. 201(b)(2). Indeed, one need only look at the issues of these various publications to confirm that the articles were, in fact, published. Also, the defendants attached six of the articles to their affidavit in support of their original motion to dismiss the complaint (see Ex. D. to original Dziubek Decl.). Accordingly, the plaintiffs had notice of the articles and the argument the articles support when they prepared their papers in opposition to the motion to dismiss. See Rothman, 220 F.3d at 92 (taking judicial notice of public documents attached to defendants' moving papers). Based on the foregoing, the Court takes judicial notice of the fact that the above newspaper articles were published.
*322 The Court finds that the plaintiffs' substantial financial losses; the NASD charges against Sterling Foster; the SEC lawsuit against Sterling Foster; the many private lawsuits against Sterling Foster; and the Greenberg arbitration against Bear Stearns & Co., and BSSC; as well as the widespread media coverage of Sterling Foster's allegedly fraudulent conduct constitute "circumstances that would suggest to an investor of ordinary intelligence the probability that he has been defrauded." Dodds, 12 F.3d at 350. Indeed, this financial and legal data, together with the media attention, provided the investors, who used Sterling Foster as a broker, "with sufficient storm warnings to alert a reasonable person to the [probability] that there were either misleading statements or significant omissions involved in the sale of the [securities]." In re Integrated Resources, 815 F.Supp. at 638.
As such, the Court finds that the plaintiffs were on inquiry notice as of May 30, 1997. The Court has chosen May 30, 1997, because it is two weeks after Greenberg filed his statement of claim and falls in a lull of media coverage. The fact that the Court finds these plaintiffs to have been on inquiry notice as of May 30, 1997, while the plaintiffs in Rogers, 97 CV 189, were found to be on inquiry notice as of October 9, 1996 is not an inconsistent conclusion. Here, the plaintiff class consists of people who purchased shares of ML Direct from September 4, 1996 through December 31, 1996, while the plaintiffs subclasses in Rogers consisted of individuals who purchased shares of the companies only until October 8, 1996. Indeed, the Court could not find that plaintiffs who purchased their shares in December were on inquiry notice two months earlier. Accordingly, the investor's duty to exercise reasonable diligence in investigating the alleged fraud arose on May 30, 1997. See Rothman, 220 F.3d at 97; Dodds, 12 F.3d at 350.
As discussed above, for a plaintiff on inquiry notice, the statute of limitations commences not when the duty to inquire arises but when, in the exercise of reasonable diligence, the plaintiffs should have discovered the facts underlying the fraud. See Rothman, 220 F.3d at 97; Dodds, 12 F.3d at 350. Here, the plaintiffs do not explain either in the complaint or in their motion papers, the steps they took to investigate the probability that they had been defrauded by Bear Stearns. They assert only that they received actual notice of Bear Stearns' participation in the fraud in September 1998 when a Bear Stearns official testified in the Greenberg arbitration. However, as noted above the commencement of the statute of limitations for a Section 10(b) claim is not restricted to the date potential plaintiffs receive actual notice of the fraud but also includes the date on which a "reasonable investor of ordinary intelligence would have discovered the existence of the fraud." Dodds, 12 F.3d at 350; see Rothman, 220 F.3d at 96; Menowitz, 991 F.2d at 41-42.
Indeed, such a conclusory argument regarding reasonable diligence is insufficient to overcome a defendant's claims that a plaintiff failed to exercise such care. See Giant Group, Ltd. v. Sands, 142 F.Supp.2d 503, 509 (S.D.N.Y.2001). As such, the failure by the plaintiffs to show that they exercised any diligence in seeking to uncover the facts underlying the fraud leaves this Court to conclude that the claims against Bear Stearns, which were filed more than two years after the plaintiffs received inquiry notice of the fraud, are time-barred. See Dodds, 12 F.3d at 350 (holding that knowledge is imputed to the investor who fails to make a reasonably diligent investigation following receipt of inquiry notice).
Moreover, the Court finds that a reasonable investor of ordinary intelligence would *323 have discovered the alleged involvement of Bear Stearns in the purported fraud prior to February 16, 1998, which date must be the date of discovery in light of the fact that the complaint was filed on February 16, 1999, and there is a one-year statute of limitations. Accordingly, the plaintiffs' claims are barred for this reason as well.
Although large, full-service brokerage firms perform all of the steps necessary to complete a securities transaction within their own firm, many of the smaller investment banks and brokerage firms "may lack the capital, technology, personnel, or expertise" to do so. See Henry F. Minnerop, The Role and Regulation of Clearing Brokers, 48 Bus. Law. 841, 841 (1993). Smaller firms in this position enter into "clearing agreements" by which they introduce their customer accounts to clearing firms that perform functions the "introducing firms" cannot or choose not to perform themselves. Id. at 842-43. At a minimum, clearing firms compare and settle or clearintroduced transactions, which means that they "pay[] for the securities purchased and deliver[] securities sold in the accounts introduced to them pursuant to clearing agreements." Id. There are two types of clearing agreements in the securities industry: "fully disclosed" and "omnibus." Id. at 843. In fully disclosed clearing agreements, the customer and clearing firm are identified. Id. However, in an omnibus clearing agreement, neither the clearing firm, nor the introducing firm's customers are aware of each others' identities. Id.
The plaintiffs' complaint suggests that Sterling Foster may have had a fully disclosed clearing agreement with Bear Stearns because it alleges that the confirmations Bear Stearns sent to Sterling Foster customers informed the customers that their broker was the principal and, thus, an entity distinct from that sending the customer the confirmation. However, on a motion to dismiss, it is not the Court's function to weigh the evidence before it. Villager Pond, 56 F.3d at 378. Thus, the Court will presume, for the purposes of this motion, that Sterling Foster and Bear Stearns had an omnibus agreement. The Court further presumes that Sterling Foster's customers were unaware that their broker had even contracted with a clearing firm to process their transactions. See Minnerop, supra, at 843 (stating that at times "customers of the introducing firm may not even know that their broker has contracted with a clearing firm to process their transactions").
Nevertheless, the Court finds that a reasonable investor of ordinary intelligence would have discovered Bear Stearns' identity and alleged involvement in the scheme to defraud well before February 17, 1998. First, after learning that the NASD had charged Sterling Foster with defrauding customers, a reasonable investor of ordinary intelligence would investigate how Sterling Foster operated. Even minimal research on small investment banks and brokerage houses would reveal that many of these firms use clearing brokers. See Minnerop, at 842-43. Thus, in all likelihood, the Sterling Foster customers would have learned that fact early in their investigation. Upon learning that another broker may have been involved in the alleged scheme, the next step in the reasonable investors research would be an attempt to discover the identity of that broker and the extent of its involvement. In the Court's view, such an investigation would not have been time consuming, and a reasonable investor who commenced a reasonable diligent investigation on October 9, 1996, would have discovered those facts well before February 17, 1998.
For example, on August 5, 1997, Joe Price commenced a suit in the Eastern District of Texas that named BSSC as a *324 defendant, see Price v. Sterling Foster & Co., Inc. et al., E.D. Tex. 97 CV 201, E.D.N.Y. 98 CV 1470. The complaint in Price, of which this Court takes judicial notice, see Kramer, 937 F.2d at 774 (courts may take judicial notice of documents filed in other courts but not for the truth of the matters asserted therein), alleges that BSSC was the clearing firm for all of Sterling Foster's trades (Price complaint ¶ 32). The complaint also asserts that BSSC sent out monthly statements that "reflected unrealistic valuation of the securities based only on the price of the market maker(s)" (Price complaint ¶ 31). Price claims that BSSC was aware of Sterling Foster's fraudulent practices and assisted Sterling Foster in carrying them out by mailing false monthly statements and receiving money from purchasers of stock sold by Sterling Foster. Price also alleges that BSSC had a possible conflict because the president of the clearing corporation was the father of the president of Embryo Development Corporation, a company whose IPO Sterling Foster underwrote. In light of the fact that Price filed a lawsuit in August 1997 that named BSSC as a defendant, the Court finds that a reasonable investor of ordinary intelligence conducting a reasonably diligent investigation would have discovered the facts underlying the alleged fraud by Bear Stearns well before February 9, 1998.
Furthermore, Greenberg learned of Bear Stearns' identity by May 13, 1997, when he filed the NASD arbitration against them. The Statement of Claim commencing that arbitration alleges that Greenberg purchased shares of ML Direct on September 4, 1996, September 10, 1996, and October 8, 1996 upon the solicitation of Sterling Foster. The Statement of Claim asserts that Bear Stearns performed all of Sterling Foster's clearing functions, and in that position, became a joint venturer with Sterling Foster in perpetrating a scheme to manipulate the market for ML Direct securities. Greenberg alleges that Bear Stearns knew Sterling Foster was short approximately 3.4 million shares of ML Direct and permitted Sterling Foster to remain short those shares past the settlement date. By not requiring Sterling Foster to deliver the shares of ML Direct, Greenberg claims that Bear Stearns, in effect, loaned Sterling Foster the value of those shares, which was a sum of $42 million. Greenberg also asserts that Bear Stearns knew that Sterling Foster made a profit of $24.6 million when it ultimately covered its short position with shares from the Selling Securityholders. The Statement of Claim also alleges that Sterling Foster would not have been able to manipulate the market of ML Direct securities without Bear Stearns involvement in the scheme and that Bear Stearns profited from its role.
Clearly, if Greenberg could discover and allege this information regarding Bear Stearns by May 13, 1997, a reasonable investor of ordinary intelligence exercising reasonable diligence would have discovered the allegations in the present complaint prior to February 16, 1998. This is especially true considering the fact that the reasonable investor's investigation would have been assisted by the allegations in the Greenberg Statement of Claim, which are not all that different from the allegations in the present complaint. The plaintiffs argue that because the Greenberg arbitration does not allege any evidence of Bear Stearns' actual knowledge in advance of the fraud, the Statement of Claim cannot be used to show that as of May 13, 1997, a reasonable investor would have been aware of the extent of Bear Stearns' involvement in the scheme as that role is alleged in the plaintiffs complaint.
This argument misses the mark. The Court does not find that the plaintiffs should have discovered the facts underlying *325 Bear Stearns' involvement by May 13, 1997. Rather, the Court concludes that if Greenberg could have alleged the information contained in the Statement of Claim on May 13, 1997, a reasonable investor of ordinary intelligence exercising reasonable diligence would have discovered the allegations in the complaint prior to February 16, 1998. The Court finds that the plaintiffs' failure to do so and noting the absence of a reason for such failure, renders the federal securities claims against Bear Stearns barred by the one-year statute of limitations. See 15 U.S.C. §§ 78i(e); Lampf, Pleva, Lipkind, Prupis, 501 U.S. at 364, 111 S.Ct. 2773, 115 L.Ed.2d 321.
The plaintiffs also argue that the statute of limitations should be equitably tolled because the defendants fraudulently concealed their involvement in the fraud by denying it. Contrary to the plaintiffs' proposition, the doctrine of equitable tolling based on fraudulent concealment does not apply to claims for securities fraud under Section 10(b). In Lampf, the Supreme Court held that although time limits in lawsuits are subject to equitable tolling, "it is evident that [this venerable principle] principle is fundamentally inconsistent with the 1-and-3-year structure." Id. The Court explained that "[t]he 1-year period, by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary." Id. In addition, the 3-year limit is a period of repose that serves as a cutoff and, therefore, is inconsistent with tolling. Id. Accordingly, tolling principles also do not apply to the 3-year period of repose. Id.
Thus, the Court finds the plaintiffs' assertion that the statute of limitations should be tolled based on Bear Stearns' alleged fraudulent concealment is without merit. See Lampf, 501 U.S. at 363, 111 S.Ct. at 2782; Dafofin, 2001 WL 940632 (explaining that although doctrine of equitable tolling applies in fraud cases, it does not apply in cases brought under the Securities Acts); Komanoff v. Mabon, Nugent & Co., 884 F.Supp. 848, 853 (S.D.N.Y.1995) (declining to apply doctrine of fraudulent concealment after the Supreme Court's decision in Lampf); Falik v. Parker Duryee Rosoff & Haft, 869 F.Supp. 228, 232 (S.D.N.Y.1994); Siemens v. Atlantic Richfield Co., No. 93 Civ. 1126 (LAP), 1994 WL 86368 (S.D.N.Y. March 16, 1994); Cohen v. Prudential-Bache Sec., 777 F.Supp. 276, 279 (S.D.N.Y.1991) ("Whereas equitable tolling generally applies in fraud cases, the doctrine does not apply to claims for securities fraud under section 10(b)."); see also Tregenza v. Great Am. Comms. Co., 823 F.Supp. 1409, 1415 (N.D.Ill.1993) ("A party cannot both have inquiry notice and merit equitable tolling."); Manning v. Maloney, 787 F.Supp. 433, 436 (M.D.Pa.1992) ("Equitable tolling under the doctrine of fraudulent concealment does not apply to [Securities and Exchange Act] actions."); In re Rospatch Sec. Litig., Nos. 90 Civ. 805, 90 Civ. 806, 90 Civ. 85, 1991 WL 335253 (W.D.Mich. Oct. 11, 1991) ("Lampf overruled any equitable tolling in prior law.").
The Court also notes that the plaintiffs' reliance on In re Merrill Lynch Limited Partnerships Litigation, 154 F.3d 56 (2d Cir.1998) is misplaced because that case involves claims brought pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68. Accordingly, the Court finds that the plaintiffs claims brought pursuant to Sections 10(b) and 20(a) of the Exchange Act are barred by the statute of limitations. As such, the Court grants the motion by Bear Stearns to dismiss the federal securities claims, and those claims are dismissed.

B. The Claim for Common Law Fraud
Having dismissed the federal causes of action, this Court retains subject matter *326 jurisdiction over the plaintiffs' claim for common law fraud if: (1) the parties are diverse and the amount in controversy exceeds the sum of $75,000, see 28 U.S.C. § 1332(a); or (2) the Court chooses to exercise supplemental jurisdiction over the claim, see 28 U.S.C. § 1367(a). To invoke diversity of citizenship jurisdiction, the complaint must allege complete diversity, which means that no plaintiff is a citizen of the same state as any defendant. See Herrick Co., Inc. v. SCS Communications, Inc., 251 F.3d 315, 322 (2d Cir.2001) ("[D]iversity jurisdiction is available only when all adverse parties to a litigation are completely diverse in their citizenship."); Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 68 (2d Cir.1990) ("It is well established that for a case to come within this statute there must be complete diversity and that diversity is not complete if any plaintiff is a citizen of the same state as any defendant."). Here, the plaintiffs and defendants are not completely diverse, because the complaint alleges that one of the plaintiffs, Stephen G. Siben, and both of the defendants are New York citizens. Accordingly, the Court lacks diversity jurisdiction over the common law fraud claim.
Section 1367(a) provides district courts that have original jurisdiction over some claims with supplemental jurisdiction "over all other claims that are so related to claims in the action with such original jurisdiction that they form part of the same case or controversy under Article III." However, a Court may decline to exercise supplemental jurisdiction over a claim if, among other things, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(b). Here, the Court has dismissed all of the claims over which it had original jurisdiction. As such, it declines to exercise supplemental jurisdiction over the claim for common law fraud, and that claim is dismissed without prejudice.

III. CONCLUSION

Based on the foregoing, it is hereby
ORDERED, that the motion by the defendants to dismiss the complaint pursuant to Rule 12(b)(6) is GRANTED, and the complaint is DISMISSED; and it is further
ORDERED, that the Clerk of the Court is directed to close this case.
SO ORDERED.