Robert LEVITT, for himself and as custodian for Richard Levitt and Monica Levitt, Robert Rice, Stephen G. Siben, Stephen Strobehan, Stanley Veltkamp, Philip C. Vitanza, for himself and Elizabeth Vitanza and Luke Vitanza, John T. White, as Trustee, Guy V. Wood, as Trustee, Carl Zander, Jr., as Trustee, Ted. M. Jones, as Trustee, and Kathryn N. Jones, as Trustee, Plaintiffs–Appellants.

v.

**BEAR STEARNS & CO., INC. and Bear Stearns Securities Corporation, Defendants–Appellees.**

Docket No. 02–7860.

United States Court of Appeals, Second Circuit.

Argued: May 2, 2003.

Decided: Aug. 13, 2003.

Leslie Trager, Morley and Trager, New York, NY, for Plaintiffs–Appellants.

Peter L. Zimroth, Arnold & Porter, New York, NY, (Michael D. Schissel and David

A. Weintraub, Arnold & Porter, New York, NY, Stephen M. Sacks and Scott B. Schreiber, Arnold & Porter, Washington, DC, on the brief), for Defendants–Appellees.

Before: WALKER, Chief Judge, and MINER and KATZMANN,* Circuit Judges.

MINER, Circuit Judge.

This is an appeal from a final judgment entered in the United States District Court for the Eastern District of New York (Spatt, J.), dismissing for failure to state a claim the complaint in a federal securities fraud class action filed against defendant-appellee Bear Stearns Securities Corp. and its corporate parent, defendant-appellee Bear Stearns & Co., Inc. (collectively, "Bear Stearns"). See In re Sterling Foster & Co., Inc. Sec. Litig., 222 F.Supp.2d 312 (E.D.N.Y.2002) ("Levitt"). The putative plaintiff class consists of members of the public who purchased securities of ML Direct, Inc. ("ML Direct") from the Long Island brokerage firm of Sterling Foster & Co., Inc. ("Sterling Foster") during the approximately three-and-a-half months following ML Direct's initial public offering ("IPO"). Id. at 314. The gravamen of Plaintiffs' complaint is that Bear Stearns knowingly and actively participated in a stock fraud scheme perpetrated by Sterling Foster involving the ML Direct IPO.

The District Court determined that Plaintiffs' claim was time barred. Specifically, the District Court found, as a matter of law, that there were sufficient "storm warnings" that would have caused a reasonably prudent investor to discover Bear Stearns' alleged role in the Sterling Foster scheme at least one year before Plaintiffs filed their class action complaint. Id. at 318–26. For the reasons set forth below, we hold that the District Court's conclusion is not supported by the facts contained in the pleadings, when viewed in the light most favorable to Plaintiffs. Accordingly, we vacate the judgment and remand the case to the District Court for further proceedings consistent with this opinion.

## BACKGROUND

The facts alleged in the class action complaint filed by Plaintiffs are based in large part on a 1998 federal indictment filed in the Southern District of New York against two officers of Sterling Foster, a 1997 civil action filed in the Southern District of New York by the Securities and Exchange Commission ("SEC") against Sterling Foster, and testimony taken during a 1997 arbitration brought against Bear Stearns before the National Association of Securities Dealers ("NASD").

I. *Sterling Foster's Market Manipulation Scheme*

On September 3, 1996, the registration statement for the ML Direct IPO became effective for the sale of 1.1 million shares. Id. at 314. The original issue was sold to the public at a price of $15 per unit, with each unit consisting of two shares of common stock and one warrant for the purchase of a share of common stock at a fixed price in the future, so that the price per share was slightly less than $7.50 per share. Id. The IPO was underwritten by Patterson Travis, Inc. Id.

When the registration statement became available, it disclosed the fact that a preregistered but delayed registration—known as a "shelf" registration—had been "piggy-

---

* Judge Pierre N. Leval, originally a member of the panel, recused himself subsequent to oral argument. Judge Robert A. Katzmann was appointed as the third member of the panel on May 12, 2003, pursuant to 2d Cir. R. § 0.14(b).

backed" onto the IPO. This shelf registration pertained to 2.4 million additional shares of ML Direct common stock owned by certain insider selling shareholders (the "Selling Insiders"). These shares were subject to a twelve-month "lockup," i.e., they could not be sold for twelve months after the IPO, although the lockup could be waived by the underwriter, Patterson Travis. *Id.* In particular, the IPO registration statement and prospectus stated that Patterson Travis had "no agreements or understandings with any of the [Selling Insiders] with respect to release of the [Selling Insiders' shares] prior to the [expiration of the lockup period] and ha[d] no present intention of releasing any or all of such securities prior to [the expiration of the lockup period]." *Id.*

On September 4, 1996—the first day that ML Direct stock was publicly traded—Sterling Foster bought up the majority of the ML Direct shares, driving the price to $15.25 per share at the close of trading. *Id.* During the first two days of trading, Sterling Foster sold over 3.375 million shares of ML Direct. Since there were only 1.1 million shares for sale in the IPO, Sterling Foster had sold approximately 2.3 million shares more than it actually owned. This situation, known in the securities industry as "taking a short position" or "selling short," posed a problem only insofar as the only other available ML Direct shares were the shares that had been registered for the Selling Insiders, which were subject to the twelve-month lockup. *Id.* The September 9 settlement date for the shares sold by Sterling Foster on September 4 came and went without Sterling Foster delivering to Bear Stearns the shares required to cover its short position. *Id.* However, Patterson Travis had agreed to waive the lockup on the Selling Insiders' shares as of September 10, so that Sterling Foster was able on September 11 and 12 to deliver to Bear

Stearns shares that it had secretly purchased from certain of the Selling Insiders for $3.25 per share. *Id.* Thus, when it covered its short position, Sterling Foster made a profit consisting of the difference between the price at which it sold the shares to the public ($14 to $15 per share) and the price it paid to the Selling Insiders ($3.25 per share), a total of approximately $24 million. *Id.* at 315.

This market manipulation scheme, along with the misrepresentations in the offering documents that Patterson Travis had made no prior agreements with the Selling Insiders concerning the sale of their shares before the expiration of the lockup period, caused the investing public to believe that only 1.1 million shares of ML Direct were being offered. *Id.* In fact, three times that number of shares were being sold, most via short sales at inflated prices. *Id.* Indeed, the investing public believed that the market had set the price of $13 to $15 per share when, in fact, that price had been artificially created by Sterling Foster, which was at the same time purchasing shares from the Selling Insiders at only $3.25 per share. *Id.*

## II. *Bear Stearns' Alleged Role in Sterling Foster's Scheme*

Bear Stearns acted as the "clearing agency" for Sterling Foster. "At the center of the securities industry, clearing firms provide the necessary services and capital typically needed by small brokerage houses to complete a securities transaction, most importantly, the clearing function." Daphna Abrams, Note, *A Second Look at Clearing Firm Liability*, 67 Brook. L.Rev. 479, 484 (2001) ("Abrams") (footnote omitted). "A clearing firm *clears* trades, i.e., completes transactions by delivering securities to the purchasing broker-dealer and by making money payments to the selling broker-dealer." *Id.*

(footnote omitted). "Clearing responsibilities include: receiving or delivering funds from or to the customer; maintaining records that reflect the transaction; and safeguarding the funds in the customer's account." *Id.* (internal quotation marks omitted). "A clearing firm is also responsible for maintaining records of all trades made by the customer, including sending confirmations, monthly statements, and dividends to the customer/investor." *Id.* "Additional clearing services include the extension of credit for the purchase of securities on margin." *Id.* at 485. "Small brokerage firms, commonly referred to as 'introducing firms,' typically lack sufficient capital, back office technology and personnel to 'self clear.'" *Id.* at 484 (footnotes omitted). "As a result, they enter into 'carrying agreements' with clearing firms to out source clearing and other services." *Id.* "In addition to performing clearing functions, on occasion, the clearing firm executes transactions, thereby limiting the role of the introducing broker to simply soliciting investor sales." *Id.* at 485. "The clearing firm also provides name recognition for the introducing firm, frequently inflating the image of a small, unknown introducing firm. The name Bear Stearns, for example, lends credibility, stability, business savvy, and expertise to unknown introducing firms." *Id.* Finally, "because clearing firms are relatively well capitalized, they become deep pocket litigation targets." *Id.* at 479 n. 2 (internal quotation marks omitted) (quoting Henry F. Minnerop, *The Role and Regulation of Clearing Brokers,* 48 Bus. Law 841 (1993)).

Plaintiffs alleged that Sterling Foster effectively acted as an underwriter with respect to the Selling Insiders' ML Direct Shares. Bear Stearns allegedly required that, before it would agree to clear transactions for introducing brokers (such as Sterling Foster) acting as "underwriters," the introducing brokers had to request permission from Bear Stearns. *Levitt,* 222 F.Supp.2d at 315. Consequently, prior to August 20, 1996, Sterling Foster purportedly requested that Bear Stearns permit Sterling Foster to "underwrite" the sale of the Selling Insiders' shares. *Id.* At the time of this request, officers at Bear Stearns allegedly knew that Sterling Foster intended to sell a lot of shares after the effective date of the ML Direct IPO and to take a substantial short position of approximately 2.4 million shares in its Bear Stearns trading account. *Id.* Officers at Bear Stearns also allegedly were aware that this short position would not be covered by the settlement date, but that it would later be covered from shares to be received from the Selling Insiders. *Id.*

Prior to the IPO, Bear Stearns officers requested and received a copy of the ML Direct IPO preliminary prospectus, which contained the lock-up language discussed above. *Id.* Thus, these officers allegedly knew that the representations made concerning the lock up were false. *Id.*

Prior to September 3, 1996, Bear Stearns agreed to act as a clearing agent for the "underwriting" of the Selling Insiders' shares but required that Sterling Foster deposit another $3 million with Bear Stearns and that Sterling Foster's president provide a personal guarantee for any losses Bear Stearns might incur. *Id.* Bear Stearns also allegedly knew, on or before September 12, that Sterling Foster covered its short sales with the Selling Insiders' shares and made a profit of approximately 400%. Bear Stearns is charged with this knowledge because: (i) the money was paid out by Bear Stearns to the Selling Insiders from the Sterling Foster trading account; (ii) officials at Bear Stearns received documents disclosing the number of shares being delivered and the price to be paid for those shares; and (iii) there was information related to these

sales in records maintained by Bear Stearns in its capacity as clearing agent. *Id.*

On September 5, when Sterling Foster's trading account was short approximately 2.3 million shares, Bear Stearns extended credit to Sterling Foster. *Id.* Moreover, during the two to three days when Sterling Foster's settlement account at Bear Stearns was delinquent, Bear Stearns became an unsecured creditor of Sterling Foster for more than $23 million, but did not charge Sterling Foster any interest on this amount. *Id.*

Finally, Bear Stearns sent purchasers of ML Direct stock (i.e., Sterling Foster's brokerage customers) confirmations stating "Your broker makes a market in this security, and acted as principal." *Id.* at 316. This statement was allegedly false because it implied that these purchases were market transactions, when Bear Stearns allegedly knew that the real purchaser of these shares was Sterling Foster, which was making a 400% profit on the transactions. *Id.* Bear Stearns received twenty-three dollars for each trade of ML Direct by Sterling Foster that it cleared. *Id.*

### III. *Other Proceedings*

As noted above, in drafting their complaint, Plaintiffs relied on several other proceedings that had been initiated in 1997. We briefly summarize three of those proceedings below.

### A. *SEC Proceeding*

In February 1997, the SEC filed a civil action against Sterling Foster and certain of its shareholders, officers, and employees, alleging securities fraud in connection with several IPOs underwritten or brokered by Sterling Foster, including the ML Direct IPO. *Id.* at 319.

### B. *NASD Arbitration*

The following month, Howard Greenberg, who was represented by Plaintiffs' counsel, initiated an NASD arbitration proceeding against Bear Stearns alleging fraud and market manipulation with respect to the latter's conduct as clearing agent in several transactions, including the ML Direct IPO. *Id.* The Statement of Claim filed in that arbitration alleged that Bear Stearns:

> fail[ed] to comply with applicable law [and] was a joint venturer with Sterling Foster in that it knowingly facilitated and made possible Sterling Foster's fraud by allowing Sterling Foster to perform transactions without meeting the requirements of the relevant laws, rules, and regulations and by allowing Sterling Foster to take positions which were in direct and gross conflict with that of its customers.

Thus, "[w]ithout Bear Stearns knowing participation, Sterling Foster could not have successfully committed the fraud and manipulated the market as it did." *See id.* at 324.

In support of these allegations, the Statement of Claim alleged facts that were also alleged by Plaintiffs here. Those facts were that:

> (1) Bear Stearns knew that the ML Direct IPO registered only 1,104,000 shares but that, as of the close of business on September 4, Sterling Foster was short 3.3 million shares;
>
> (2) Bear Stearns became an unsecured creditor of Sterling Foster as of September 4, 1996 by failing to have Sterling Foster deposit a security, in violation of securities regulations;
>
> (3) Bear Stearns failed to require Sterling Foster to deposit shares to cover its short position by the settlement date of

September 9, 1996, in violation of securities regulations;

(4) Bear Stearns knew, or should have known, of the 400% profit made by Sterling Foster; and

(5) Bear Stearns and its employees secretly profited from Sterling Foster's fraudulent scheme.

Missing from the statement of claim (and present in the complaint filed in the District Court) were allegations that:

(a) Prior to September 3, 1996, the effective date of the ML Direct IPO, Bear Stearns required Sterling Foster to seek its consent to act as an underwriter;

(b) Prior to September 3, 1996, Bear Stearns knew about the lock-up agreement and that Sterling Foster had permission from Patterson Travis to do an end run around it; and

(c) Bear Stearns knew that the language quoted in the confirmations sent by Bear Stearns to purchasers of ML Direct stock was false.

Plaintiffs assert that the facts supporting these allegations did not come to light until the seven-day arbitration hearing. The arbitrators dismissed Greenberg's claim grounded in Bear Stearns' purported failure to send him a prospectus and ultimately dismissed his remaining claims. On March 9, 1999, the arbitrators issued a written award confirming their decision to dismiss. *See Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 25 (2d Cir.2000). In January 1999, Greenberg brought an action in the Southern District of New York to vacate the arbitration award, which Judge Martin declined to vacate in a decision dated August 1999. This Court affirmed that decision in August of 2000. *See id.*

### C. *Texas Litigation*

In August 1997, one Joe Price (who was not represented by Plaintiffs' counsel) commenced an action in the United States District Court for the Eastern District of Texas against Sterling Foster and Bear Stearns, alleging violations of the federal securities laws. *See Levitt,* 222 F.Supp.2d at 323–24. The excerpts from the complaint reproduced in the record do not indicate whether Price was someone who had purchased or sold ML Direct shares during the period that was the subject of Plaintiffs' complaint. Nevertheless, he did allege that:

(1) "[t]he monthly statements sent out by Bear Stearns reflected unrealistic valuations of the securities based only on the prices of the market maker(s)";

(2) "since the market maker was Sterling Foster, Bear Stearns was assisting in the fraudulent practice by reflecting unreliable monthly valuations"; and

(3) "Bear Stearns, as clearing agent for Sterling Foster, acted recklessly in failing to discover Sterling Foster's fraudulent practices and assisted Sterling Foster in carrying out said practices."

█ Although the record does not indicate what became of this action, we take judicial notice of the facts that: (1) on March 6, 1998, the case was transferred by the Judicial Panel on Multidistrict Litigation ("JPML") to the District Court; and (2) on the same date that the District Court dismissed the present action, it dismissed Price's action against Bear Stearns, pursuant to Rule 12(b)(6), for failure to state a claim. *See In re Sterling Foster & Co., Inc. Sec. Litig.,* 222 F.Supp.2d 289, 302–12 (E.D.N.Y.2002) (*"Price"*).

### IV. *Proceedings in the District Court*

Plaintiffs commenced this action in February 1999 by filing a four-count complaint in the Southern District of New York against Bear Stearns alleging federal causes of action for securities fraud and

market manipulation and a state-law cause of action for common-law fraud. *Levitt*, 222 F.Supp.2d at 316. In April 1999, the JPML transferred the case to the Eastern District of New York as a "tag-along" to ten other class actions involving Sterling Foster that had been consolidated there. *Id.* at 313. In August 1999, Bear Stearns moved to dismiss the case, pursuant to Fed.R.Civ.P. 12(b)(6), on the ground, inter alia, that the federal securities claims were time barred. *Id.* In a published opinion and order dated June 27, 2002, Judge Spatt granted Bear Stearns' motion to dismiss. *Id.* at 316–26. Essentially, the District Court found that the federal claims were barred by the one-year statute of limitations because "a reasonable investor of ordinary intelligence exercising reasonable diligence would have discovered the allegations in the … complaint prior to February 16, 1998," i.e., one year before the complaint was filed. *Id.* at 324. The District Court then dismissed without prejudice the pendent common-law fraud claim. *Id.* at 325–26. Final judgment was entered on July 9, 2002, and this timely appeal followed.

## DISCUSSION

### I. *Standard of Review*

A complaint should not be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A court's task "in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *Id.* (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Com-*

*modities Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)). Furthermore, a court must "accept as true all factual allegations in the complaint." *Id.* We review de novo a dismissal for failure to state a claim. *Id.*

### II. *Governing Legal Principles.*

██ Federal securities fraud claims must be brought both within one year of the discovery of the facts underlying the alleged violation, and within three years of the alleged violation. 15 U.S.C. § 78*i* (e); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). The one-year limitations period begins to run after the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir.1992). Furthermore, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises." *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir.1993). The circumstances that give rise to a duty of inquiry are often referred to as "storm warnings." *Id.* Once a plaintiff receives these "storm warnings" and a duty of inquiry arises, "knowledge will be imputed to the investor who does not make such an inquiry." *Id.* Moreover, whether the securities fraud claim of a plaintiff who receives "storm warnings" is time barred "turns on *when*, after obtaining inquiry notice," the plaintiff "in the exercise of reasonable diligence, should have discovered the facts underlying the [defendant's] alleged fraud." *Rothman v. Gregor*, 220 F.3d 81, 97 (2d Cir.2000).

### III. *When Were Plaintiffs Put on Inquiry Notice?*

In concluding that Plaintiffs' claims were time barred, the District Court began its

analysis with the question of when Plaintiffs' duty of inquiry arose. According to the court, "the financial and legal data, together with the attention the press paid to Sterling Foster's allegedly fraudulent conduct provided sufficient storm warnings to alert a reasonable person in May 1997 to the probability that he had been defrauded." *Levitt,* 222 F.Supp.2d at 319. The financial data alluded to by the District Court were Plaintiffs' investment losses. *Id.* The legal data alluded to were the several civil actions filed by private plaintiffs and the SEC against Sterling Foster beginning in late 1996 and early 1997, as well as the *Greenberg* NASD arbitration filed against Bear Stearns in May 1997. *Id.* Based on all of the above, the District Court found that Plaintiffs were on inquiry notice as of May 30, 1997—a date selected by the court because it fell "two weeks after Greenberg filed his statement of claim" and fell "in a lull of media coverage." *Id.* at 322.

In this appeal, the issue of when Plaintiffs' duty of inquiry arose does not appear to be in dispute. Indeed, Plaintiffs conceded both in their reply brief and during oral argument that their duty of inquiry arose during the last calendar quarter of 1996, almost contemporaneously with their actual knowledge of their investment losses.

IV. *When Should a Reasonable Investor Have Discovered Bear Stearns' Alleged Involvement in Sterling Foster's Fraudulent Scheme?*

The District Court next turned to the question of whether "a reasonable investor of ordinary intelligence would have discovered the alleged involvement of Bear Stearns in the purported fraud prior to February 16, 1998, which date must be the date of discovery in light of the fact that the complaint was filed on February 16,

1999." *Id.* at 322–23. Put another way, should such a reasonable investor have discovered Bear Stearns' alleged involvement in Sterling Foster's fraudulent scheme before September 1998, the date Plaintiffs claim they received actual notice of that involvement?

In answering these questions, the District Court presumed that the plaintiff class members who received the trading confirmations referenced in the complaint were not aware that Bear Stearns was the clearing agent for the transactions or that Sterling Foster had even contracted with a clearing firm to process the transactions. *Id.* at 323. According to the court, a reasonable investor should have discovered Bear Stearns' identity and alleged involvement in the scheme "well before February 17, 1998" by "investigat[ing] how Sterling Foster operated" because "[e]ven minimal research on small investment banks and brokerage houses would reveal that many of these firms use[d] clearing brokers." *Id.* And an investigation into the identity of the clearing broker and the extent of its involvement, in the court's view, "would not have been time consuming." *Id.* During oral argument, however, Plaintiffs conceded that they knew Bear Stearns was the clearing agent for Sterling Foster from the get-go. Accordingly, in deciding this appeal, we need not concern ourselves with this part of the District Court's analysis.

■ In concluding that an inquiry by a reasonable investor should have implicated Bear Stearns well before February 1998, the District Court primarily relied on the *Price* complaint filed against Bear Stearns in the Eastern District of Texas in August 1997 and the statement of claim filed in May 1997 in the *Greenberg* NASD arbitration. *Id.* at 323–25. According to the District Court, the allegations in the NASD statement of claim were "not all that different from the allegations in the

present complaint." *Id.* at 324. In our view, the District Court's analysis was flawed for several reasons.

First, there is no dispute that the complaint here contains allegations missing from the *Greenberg* statement of claim and from the *Price* complaint: (i) there was a secret agreement among Sterling Foster, the Selling Insiders, and the IPO underwriter to waive the provisions of the IPO lock-up agreement and permit the Selling Insiders to sell their 2.4 million shares to Sterling Foster for $3.25 per share; (ii) Bear Stearns knew of this secret agreement before the September 3, 1996 effective date of the ML Direct IPO; and (iii) Bear Stearns knowingly sent out false confirmation slips. The District Court failed to assess whether any of these additional allegations was necessary to state a claim of fraud against Bear Stearns.

Second, this is not a typical storm warnings case, as it was not brought against ML Direct or its officers or directors but instead against ML Direct's clearing agent. This is, therefore, not a case where Plaintiffs could allege a prima facie case against Bear Stearns simply by examining ML Direct's financial statements and media coverage of the company. *See, e.g., Rothman,* 220 F.3d at 84–87. Instead, this is a case involving the liability of a secondary wrongdoer—the clearing agent. In *Central Bank v. First Interstate Bank,* 511 U.S. 164, 167, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), however, the Supreme Court held that private civil liability under § 10(b) applies only to those who "engage in the manipulative or deceptive practice," not to those "who aid and abet the violation." In abolishing "aiding and abetting" liability for securities fraud, the Court pre-

cluded the imposition of "secondary liability [o]n persons other than the violator [or violators] of the statute." *Id.* at 184, 114 S.Ct. 1439 (internal quotation marks omitted). In other words, a person can be liable for securities fraud only if he actually violates the statute himself. In the wake of *Central Bank,* this Court has held that "a primary violator is one who 'participated in the fraudulent scheme' or other activity proscribed by the securities laws." *SEC v. U.S. Envt'l, Inc.,* 155 F.3d 107, 111 (2d Cir.1998) (quoting *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1471 (2d Cir. 1996)).

Accordingly, once Plaintiffs were on inquiry notice that they had been defrauded, they were required to exercise reasonable diligence in discovering the facts establishing Bear Stearns' knowing participation in Sterling Foster's fraudulent scheme before filing suit. We cannot say at this point that they did not do so. The District Court failed to determine whether the factual allegations contained in the *Greenberg* statement of claim or the *Price* complaint were sufficient, standing alone, to state a claim for primary liability against Bear Stearns. Moreover, assuming that the allegations were not sufficient, the District Court failed to determine whether the allegations Plaintiffs assert they could not have learned before the *Greenberg* arbitration were essential to their claim against Bear Stearns, or whether other facts alleged in the complaint would have sufficed.

Third, there were other pleading hurdles that Plaintiffs were required to overcome, in addition to the showing required to impose liability on Bear Stearns as a primary violator. For example, we have interpreted Fed.R.Civ.P. 9(b)[1] as requir-

---

**1.** Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). Bear Stearns' motion to dismiss in the case at bar included the contention that Plaintiffs had

ing complaints in federal securities fraud cases to allege "those events which they assert give rise to a strong inference that [the] defendants had knowledge of th[ose] facts ... or recklessly disregarded their existence," including "when these particular events occurred." *Ross v. A.H. Robins Co.*, 607 F.2d 545, 558 (2d Cir.1979). Moreover, since the enactment of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4 ("PSLRA"), a securities fraud complaint is subject to dismissal if plaintiffs fail to comply with the statute's scienter pleading requirement, which is essentially a codification of our decisions interpreting Rule 9(b).[2] *See* 15 U.S.C. §§ 78u–4(b)(2), –4(b)(3)(A); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001) (to satisfy PSLRA scienter requirement, plaintiffs must allege either (a) facts showing "that defendants had both motive and opportunity to commit fraud," or (b) "facts ... that constitute strong circumstantial evidence of conscious misbehavior or recklessness"); *Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir.2000) (PSLRA "did not change the basic pleading standard for scienter in this circuit"). It makes little sense from a policy perspective to require specific factual allegations—on pain of dismissal in cases of this sort—and then to punish the pleader for waiting until the appropriate factual information can be gathered by dismissing the complaint as time barred.

Given these heightened pleading requirements, it was error for the District Court to have held as a matter of law, without first determining which allegations in the pleadings were essential to state a claim against Bear Stearns: (1) that a reasonable investor of ordinary intelligence exercising reasonable diligence should have discovered sufficient facts to support filing a securities fraud claim against Bear Stearns (2) at least one year prior to the filing of the Plaintiff's complaint in February 1998. Consequently, discovery should have been permitted on the question of what information was realistically available to Plaintiffs and when it was available.

Accordingly, the District Court erred in dismissing the complaint as time barred because there are factual disputes concerning the scope of the inquiry conducted by Plaintiffs and the question of whether a reasonable inquiry could have revealed enough information to satisfy the pleading requirements for § 10(b) primary violator liability, Rule 9(b), and the PSLRA, and those factual disputes should not have been resolved in favor of Bear Stearns on a motion to dismiss.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court is vacated and the case is remanded for further proceedings consistent with this opinion.

---

failed to plead scienter as required by Rule 9(b). It is noteworthy that the District Court's decision in *Price* dismissed the federal securities fraud claims against Bear Stearns for failure to state a claim, on the ground that scienter had not been properly pled in compliance with Rule 9(b) and the PSLRA. *See Price*, 222 F.Supp.2d at 307–08.

**2.** The PSLRA's scienter requirement provides that a plaintiff in a federal securities fraud

action must plead that "the defendant acted with [the required state of mind, and], with respect to each act or omission alleged [to have violated the securities laws], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). This language "echoed this Court's [Rule 9(b) ] scienter standard." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001).