**In re SALOMON ANALYST AT & T LITIGATION**

**No. 02 Civ.6801 GEL.**

United States District Court, S.D. New York.

Dec. 2, 2004.

Marc I. Gross, John Balestriere, Pomerantz Haudek Block Grossman & Gross LLP, New York City, Lead Counsel and Attorneys for Lead Plaintiffs Louisiana School Employees Retirement System and Private Asset Management.

Martin London, Richard A. Rosen, Brad S. Karp, Eric S. Goldstein, Joyce S. Huang, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York City; Peter K. Vigeland, Wilmer, Cutler & Pickering, New York City, for defendants Citigroup

Inc., Citigroup Capital Markets, Jack Grubman, and Sanford Weill.

## OPINION AND ORDER

LYNCH, District Judge.

This case concerns allegations that the defendant bank Citigroup, Inc. ("Citigroup"), its division Salomon Smith Barney ("SSB"), its research analyst Jack Grubman, and its chief executive officer Sanford Weill engaged in scheme to defraud purchasers and sellers of stock in AT & T and AT & T Wireless, and to enrich themselves, by issuing and disseminating research analyst reports on AT & T and AT & T Wireless that were materially false and misleading. The purpose and motivation for the allegedly false and misleading reports was to garner lucrative investment banking business from AT & T for the investment banking division of SSB, which would increase the personal compensation of both Grubman and Weill, and also, on the part of Grubman and Weill, to secure additional non-monetary personal benefits. Defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted, and for failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). For the reasons that follow, the motion will be granted as to the claims regarding AT & T Wireless, and denied as to all other claims.

## BACKGROUND

For purposes of adjudicating the motion to dismiss, the facts alleged in the Complaint must be accepted as true.

### I. General Factual Allegations

Defendant Citigroup is one of the largest financial services firms in the world. At the relevant time, Citigroup was the

parent corporation of Salomon Smith Barney ("SSB"), through which Citigroup provided investment banking services to businesses, offered retail brokerage services to both individuals and institutional investors, and published research reports and ratings on publicly-traded securities. In April 2002, SSB changed its corporate name to Citigroup Capital Markets, which maintains the same headquarters as SSB and is its successor-in-interest. (Consolidated Amended Complaint ¶ 16.) [1] Until late September 2003, defendant Sanford Weill was the Chief Executive Officer and Chairman of the Board of Citigroup. (*Id.* ¶ 19.) Defendant Jack Grubman was a Managing Director at SSB and was considered its leading telecommunications industry analyst; Grubman resigned from SSB by mutual agreement in 2002. (*Id.* ¶¶ 18, 24.)

Although SSB maintained publicly that its research analyst and investment banking divisions were separate, had no conflicts of interest, and did not unduly influence each other, from at least 1997 SSB employed compensation structures and other mechanisms that created incentives for analysts to inflate their ratings of companies in order for SSB to secure lucrative investment banking business from those companies. (*Id.* ¶¶ 22–23.) For example, SSB paid "helper's fees" to analysts, which were based on the amount of investment banking fees earned from transactions involving companies covered by that analyst. (*Id.* ¶ 25.) By 2000, SSB had revamped and expanded the "helper's fee" system by creating a "scorecard" for each analyst

that listed the investment banking fees earned from companies in that analyst's coverage sector, and requiring analysts to detail their contributions to investment banking transactions as part of determining the analyst's annual compensation. (*Id.* ¶ 26.) In addition, analysts came under direct pressure from the investment banking division to tailor their coverage to avoid angering companies that SSB was pursuing for lucrative investment banking business. (*E.g., id.* ¶¶ 103–107.)

According to the Complaint, the carrot of additional compensation and the stick of institutional pressure, including the possibility of termination, provided the motivation for SSB analysts to falsify their research reports and ratings to make them more favorable than their honestly-held opinions about the companies and their stock. In particular, plaintiffs allege that the conflict of interest created by SSB's policies and actions motivated Grubman to publish false and misleading research reports on AT & T, and analyst Michael Rollins to publish false and misleading research reports on AT & T Wireless ("AWE"). (*Id.* ¶¶ 4, 6, 70–71.)

## II. *The AT & T Research Reports*

As SSB's leading telecommunications analyst, Grubman had covered AT & T for some time, and until late 1999 had consistently given AT & T lukewarm ratings and analysis. (*Id.* ¶ 35–36.) Grubman's negativity regarding AT & T was so widely known and influential that then-Chairman and CEO of AT & T Michael Armstrong

1. In their brief on this motion, defendants assert that the successor to SSB is actually Citigroup *Global* Markets, not Citigroup *Capital* Markets ("CCM"), a company that is part of Citigroup's asset management business and has no connection to the events alleged in the Complaint. Defendants thus urge that CCM be dismissed from the case. However, for purposes of this motion, this distinction matters not. The true facts as to the identity of SSB's corporate successor will be easy to ascertain in discovery, and, if defendants are correct, plaintiffs will either stipulate to the dismissal of CCM, or CCM will prevail on summary judgment. On a motion to dismiss, the factual allegations in the Complaint are accepted as true.

(who also served on the Citigroup Board) apparently told Weill (who also served on the AT & T Board) that Grubman's coverage discouraged AT & T from hiring SSB for investment banking work, which prompted Weill to urge Grubman to take a "fresh look" at the company. (*Id.* ¶¶ 37–38.) These sentiments were echoed by other executives at SSB, including Grubman himself, who acknowledged in a memo to Weill on June 30, 1999, that if Grubman were to upgrade his ranking of AT & T perhaps SSB could "make some progress in closing the deal" with AT & T and Armstrong. (*Id.* ¶¶ 39–40.) In an August 19, 1999, letter to Armstrong, Grubman, following up on a meeting with Weill and Armstrong, stated that "when my analysis is complete and if the results are in line with what you and I are both anticipating, once I'm on board there will be no better supporter than I. . . . As I indicated to you at our meeting, I would welcome the role of being a 'kitchen cabinet' member to you." (*Id.* ¶ 41.) While these discussions were occurring, Grubman continued to be publicly bearish on AT & T, issuing a report on August 30, 1999, in which he listed his "top names" in the wireless industry, with AT & T notably absent. On October 26, 1999, Grubman reiterated his "Neutral" rating for AT & T—the third of five possible ratings in use at SSB, from "Buy" to "Sell," and the lowest rating given by Grubman to any of the companies he personally covered. (*Id.* ¶ 36.)

On October 20, 1999, the AT & T Board, of which Weill was a member, discussed issuing a separate stock for AWE, a huge potential deal for the investment banks that might be chosen to underwrite and market the offering. On November 5, 1999, Grubman sent Weill a memo entitled "AT & T and the 92nd St. Y," which discussed Grubman's "progress" on the "fresh look" that Weill had asked him to give to AT & T. Grubman noted that his analysis of AT & T was "going well" and then went on to discuss the possibility of Weill assisting Grubman in getting his young twins accepted into the prestigious preschool at the 92nd Street YMHA. (*Id.* ¶ 44.)

On November 17, 1999, the AT & T Board gave final approval to the offering of AWE stock. Twelve days later, on November 29, 1999, Grubman announced he was upgrading AT & T two tiers in SSB's ranking system: from his long-standing Neutral rating to the highest possible Buy rating. In a 36–page report issued the following day, Grubman acknowledged his "Four–Year Bearishness" on AT & T, but explained it by stating that "it has been proven to us that the [cable upgrade] technology works." (*Id.* ¶¶ 45–46.) As the report was being completed, Grubman informed his staff that "the AT & T Report must be edited and mailed out to the printers today so that it can be distributed in time to meet Sandy Weill's deadline (before the AT & T [Board] meeting)." (*Id.* ¶ 50.) Following the issuance of the report, AT & T stock rose from $57.44 per share to $60 per share, an increase in market capitalization of approximately $8 billion. Bloomberg News specifically attributed the increase to Grubman's upgrade. (*Id.* ¶ 47.) Grubman reiterated his Buy rating and positive analysis several times in the subsequent days. (*Id.* ¶ 51.)

In January 2000, SSB solicited AT & T to be named underwriter of the AWE stock offering, and its "pitchbook" for the deal highlighted Grubman's recent upgrade of AT & T and touted the role he could play as a respected industry analyst in marketing the AWE stock offering to potential investors. AT & T ultimately selected SSB as joint book-running manager for the AWE offering and SSB earned $63 million in fees from the deal. (*Id.* ¶ 53.) Weill and Grubman also received

personal benefits in the months following Grubman's upgrade. In February 2000, Armstrong, in his role as a Board member at Citigroup, lent his support to Weill in his successful campaign to oust John Reed and become sole Chairman of Citigroup. (*Id.* ¶ 54.) In early 2000, Weill called a member of the board of the 92nd Street Y to say that he would be "very appreciative" if she could help get the Grubman twins accepted to the Y's preschool. After the children's admission was confirmed in March 2000, Weill instructed the president of the Citigroup Foundation to direct a $1 million donation to the Y. (*Id.* ¶ 55.) Grubman made the link between these events explicit in a series of private emails to another analyst in early 2001, when he stated that he had "used Sandy [Weill] to get my kids in 92nd St. Y pre-school ... and Sandy needed Armstrong's vote on our board to nuke Reed in showdown. Once coast was clear for both of us (i.e. Sandy clear victor and my kids confirmed) I went back to my normal negative self on [AT &] T," adding later that he "always viewed T as a business deal between me and Sandy." (*Id.* ¶¶ 68–69.)

Grubman's slide back to his former negativity on AT & T began shortly after these beneficial events—the AWE stock offering, Weill's successful ouster of Reed, and the acceptance of the Grubman twins—had been consummated. On May 17, 2000, Grubman issued a report on AT & T titled "Lowering 2001 Estimates and Target Price," in which he lowered his "target price" for AT & T from $75 to $65 per share. Although he maintained the "Buy" rating of the November 1999 report, Grubman was sufficiently negative about AT & T and its prospects that internal communications within SSB noted that "investors are perceiving [the] report as a 'virtual downgrade'." Over the next two days AT & T's stock price dropped nearly 10%. (*Id.* ¶¶ 58–59.)

On October 6, 2000, Grubman downgraded AT & T one tier, from "Buy" to "Outperform." Over the next week, AT & T's stock price dropped nearly 20%. (*Id.* ¶¶ 62, 64.) Less than three weeks later, Grubman returned to his position from 1995–1999 when he downgraded AT & T again to "Neutral" on October 25, 2000. AT & T lost 13% of its value on the day of the announcement, with a large trading volume of 42 million shares. (*Id.* ¶ 65.) The continued decline of AT & T stock throughout 2000 apparently did not come as a surprise to Grubman. He commented in an email to another analyst in January 2001 that, following his November 1999 upgrade, "the biggest thing that pissed me off is that [AT & T] did exactly as I knew they would [ (drop in price) ] for precisely the reasons I thought." (*Id.* ¶ 69.)

### III. *The AWE Research Reports*

SSB initiated coverage of AWE on May 2, 2000, shortly after the initial offering of AWE stock, which, as noted above, had been jointly managed by SSB's investment banking division. Throughout the class period, AWE was covered by SSB wireless analyst Michael Rollins, who is not named as a defendant in this action. The initial report rated AWE a Buy, though a High Risk one, and set an 18–month target price of $47 per share. (*Id.* ¶ 73.) The June 19, 2000, report reiterated the May 2 view— rating AWE a High Risk Buy and maintaining the same target price projection due to AWE's position as "the cheapest [stock] in the [wireless] sector." (*Id.* ¶ 74.) In a second report the same day, following an earnings conference call with AWE management, Rollins again repeated his Buy rating, noting the potential benefits of AWE's recent purchase of wireless assets in San Francisco, Houston, and San Diego. (*Id.* ¶ 75.) Much the same message, rat-

ing, and target price were repeated in Rollins's July 13, 2000, report on AWE.

After AWE announced the purchase of additional wireless assets in Indianapolis, SSB issued a report on July 24, 2000, reiterating its Buy recommendation in part on the basis of AWE's continued expansion and its cheap price relative to other wireless industry stocks. (*Id.* ¶ 77.) In two reports issued on July 25, 2000, Rollins reiterated the Buy rating and his 18-month target price of $47, noting that AWE had released its second-quarter earnings and had "exceeded our forecasts for all of the major benchmarks and delivered on two of its goals—accelerate cash flow growth and rapidly expand its footprint." (*Id.* ¶¶ 78–79.) The next five reports, on September 14, October 24, October 25, December 5, and December 20, 2000, were substantially similar to those that had come before—reiterating the Buy rating, maintaining the target price of $47, and commenting on positive developments such as AWE's continued expansion and its success at meeting its revenue projections. (*Id.* ¶¶ 80–83.) Throughout this period, the trading price of AWE stock continued to fall—from $34.56 on May 2 to $17.75 on December 20, 2000. (*Id.* ¶¶ 73, 83.)

On January 29, 2001, Rollins issued a report on AWE that revised his target price for the stock to $40, but maintained the Buy rating. (*Id.* ¶ 84.) A series of reports issued in the subsequent months (on February 14, April 18, April 23, April 24, April 25, June 29, July 20, and July 24, 2001) reiterated the $40 target price and maintained the Buy rating, tying the ratings to AWE's "solid" quarterly financial results or additional acquisitions, although also noting some negatives like lower-than-expected subscriber growth. (*Id.* ¶¶ 88–91.) By mid-April 2001, AWE's stock price had rebounded somewhat from its December 2000 low, and was trading at $19.75 per share on April 25, 2001. (*Id.* ¶ 90.) However, by August 17, 2001, the price had fallen again to $16.67 per share, and Rollins issued a report emphasizing the "Boundless Opportunities [for] Growth" for AWE, and maintaining the Buy rating while dropping the target price to $25 per share. (*Id.* ¶ 93.) This rating and target price remained consistent in reports issued on October 22 and 23, 2001.[2]

Reports issued on January 29 and February 8, 2002, reiterated Rollins's Buy rating but dropped the target price for AWE again to $20 per share. The trading price for AWE on February 8 was $10.75 per share. (*Id.* ¶¶ 95–96.) The April 22, 2002, report dropped the target price again to $13 per share, but retained the Buy rating, noting the growth possibilities offered by AWE's introduction of "a series of on-network national rate plans." (*Id.* ¶ 97.) This rating and target price were repeated in reports issued on April 23 and May 30, 2002. (*Id.* ¶¶ 98–99.) By June 14, 2002, AWE was trading at $6.35 per share and Rollins lowered his rating one tier to Outperform, and adjusted the target price downward again to $9 per share. The report noted that, although SSB continued to recommend "underweight" for the wireless sector as a whole, it believed that "AWE can outperform its wireless peers with an improving subscriber quality, a solid balance sheet, and a relative lower valuation." (*Id.* ¶ 100.)

## IV. *Public Knowledge of these Events*

Financial publications were reporting on possible conflicts of interest between in-

---

**2.** Although plaintiffs emphasize in their Complaint that AWE lost 24% of its value in the period from August 17 to October 23, 2001, the Court takes judicial notice of the occurrence during that period of the September 11 terrorist attacks and the concomitant effects on the U.S. economy as a whole.

vestment banking and research analysts as early as 1999. On December 6, 1999, the Wall Street Journal noted the possible connection between positive research reports and investment banking business, specifically mentioning Grubman's November 1999 upgrade of AT & T, although not alleging fraud or suggesting that Grubman's report misrepresented his true opinion. The article cited an interview with Grubman in which he explained his decision to upgrade and emphatically defended his independence and objectivity. (*Id.* ¶ 120.) Grubman repeated his no-conflict position to Business Week in May 2000, and his defense was echoed by Weill. (*Id.* ¶ 121.) Grubman likewise maintained this position when he testified before Congress regarding the fraud at WorldCom in the summer of 2002. (*Id.* ¶ 112.)

On August 18, 2003, the Wall Street Journal reported that Grubman had resigned from SSB by mutual agreement, with SSB agreeing to indemnify Grubman for legal costs associated with his work as an analyst there and paying him a substantial severance package totaling around $30 million. (*Id.* ¶¶ 113, 123.) Four days later, the Wall Street Journal reported that the New York Attorney General's Office, the SEC, and other regulators were investigating Grubman, SSB and Citigroup for conduct related to their coverage of AT & T and AT & T's decision to hire SSB for the AWE offering. (*Id.* ¶¶ 113.) That investigation ultimately resulted in a settlement that was widely reported in the media. (*Id.* ¶¶ 116–118.)

## V. *This Litigation*

Plaintiffs began this litigation on August 26, 2002,[3] and filed the Consolidated Amended Class Action Complaint ("Complaint") on October 15, 2003. In addition to describing two classes—one of persons who purchased shares of AT & T between November 29, 1999, and October 25, 2000, and one of persons who purchased shares of AWE between May 2, 2000, and June 14, 2002—the Complaint brings the following claims: (i) against Grubman, SSB, Citigroup Capital Markets, and Citigroup for violations of section 10(b) and Rule 10b–5 for material misrepresentations and omissions and false statements of opinion in the research reports on AT & T during the class period (*id.* ¶¶ 132–140); (ii) against Weill for violations of section 10(b) and Rule 10b–5 for knowingly participating in a scheme and course of conduct that resulted in the issuance of the false and misleading analyst reports on AT & T (*id.* ¶¶ 141–48); (iii) against SSB, Citigroup Capital Markets, Weill, and Citigroup as control persons for violations of section 20(a) for fraud in connection with the AT & T analyst reports (*id.* ¶¶ 149–153); (iv) against SSB and Citigroup Capital Markets for violations of section 10(b) and Rule 10b–5 for misrepresentations and omissions in the research reports on AWE (*id.* ¶¶ 154–162); (v) against SSB, Citigroup Capital Markets, and Citigroup as control persons for violations of section 20(a) for fraud in connection with the AWE analyst reports (*id.* ¶¶ 163–165).

Defendants have moved to dismiss the Complaint in its entirety on the grounds that all of the claims are barred by the statute of limitations, that plaintiffs have failed to adequately allege loss causation, that counts four and five related to AWE fail to plead fraud with particularity and are also barred by the "bespeaks caution"

---

**3.** A number of related actions, raising substantially the same allegations and claims, were consolidated on January 24, 2003, by Order of this Court. The first of these related cases, *Sved v. Salomon Smith Barney, Inc.*, 02 Civ. 6801(BSJ), was filed on August 26, 2002, which is the operative date for statute of limitations purposes.

doctrine, and that count two against Weill fails to properly allege either deceit or manipulation. For the reasons discussed below, the motion will be granted as to the claims involving AWE (counts four and five) and denied as to the claims involving AT & T (counts one, two, and three).

## DISCUSSION

### I. *Standard on a Motion to Dismiss*

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff, drawing all reasonable inferences in its favor. *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir.1996). The Court will not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Beyond the facts in the complaint, the Court may consider "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).

In general, the Federal Rules of Civil Procedure require only notice pleading and, to be deemed adequate at the pleading stage, a complaint need not use particular words nor demonstrate that plaintiff will prevail on the merits, but need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512–13, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting Fed.R.Civ.P. 8(a)). However, where, as here, plaintiff alleges fraud, the complaint must state "the circumstances constituting fraud ... with particularity." Fed.R.Civ.P. 9(b); *see*

*Stern v. Gen. Elec. Co.*, 924 F.2d 472, 476 (2d Cir.1991) ("[A]llegations of fraud must be supported by particular statements indicating the factual circumstances on which the theory of fraud is based."). "Rule 9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits." *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir.1987).

### II. *Section 10(b) Claims*

#### A. *Legal Standard*

The Securities Exchange Act protects investors by proscribing,

in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the Commission, makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b); *see SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 847–48 (2d Cir.1968) (explaining that the SEC "promulgated [Rule 10b–5] pursuant to the grant of authority given the SEC by Congress in Section 10(b) of the Securities Exchange Act of 1934," by which Congress sought "to prevent inequitable and unfair practices and to insure fairness in securities transactions general-

ly, whether conducted face-to-face, over the counter, or on exchanges").

### B. *Heightened Pleading Requirements*

For federal securities fraud claims, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737, reinforces the heightened pleading standards that apply to all claims of fraud or mistake under Federal Rule of Civil Procedure 9(b). Under the PSLRA, complaints alleging securities fraud must, first, "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u–4(b)(1)(B); and second, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2); *see Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001). That state of mind is scienter, which means "intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see also Kalnit,* 264 F.3d at 138 (same).

■ The Second Circuit has made clear, however, that the PSLRA "did not change the basic pleading standard for scienter in this circuit." *Novak v. Kasaks,* 216 F.3d 300, 310 (2d Cir.2000); *see also Kalnit,* 264 F.3d at 138 (same). Both before and after the PSLRA, the law required plaintiffs bringing claims under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, to allege scienter with particularity. *Id.; compare Novak,* 216 F.3d at

307 (emphasizing that securities fraud allegations must "give rise to a strong inference of fraudulent intent"), *with* 15 U.S.C. § 78u–4(b)(2) (codifying the PSLRA's requirement that securities fraud complaints "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]").

### C. *Application to this Case*

■ To state a cause of action under section 10(b) and Rule 10b–5, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." *Lawrence v. Cohn,* 325 F.3d 141, 147 (2d Cir.2003) quoting *Ganino v. Citizens Util. Co.,* 228 F.3d 154, 161 (2d Cir.2000). *See In re WorldCom, Inc. Securities Litigation,* 294 F.Supp.2d 392, 410 (S.D.N.Y.2003).

#### 1. *Pleading Falsity and Scienter Regarding AWE*

■ Defendants argue that the claims regarding the research reports on AWE (counts four and five) must be dismissed because they fail to plead falsity and scienter with the particularity required by Rule 9(b) and the PSLRA.[4] (D.Mem.26–36.) It is well established that liability under section 10(b) can be predicated on statements of opinion, where it can be shown not merely that a proffered opinion was incorrect or doubtful, but that the speaker deliberately misrepresented his actual opinion. *See Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1095–96, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). However, to survive a motion to dismiss on a false statement of opinion claim, a plaintiff

---

4. Defendants have not moved to dismiss the AT & T-related claims on this ground, with good reason. Indeed, the particularity with

which the AT & T claims are presented stands in sharp contrast to the defects in the allegations related to AWE.

"must 'allege with particularity' 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false." *Bond Opportunity Fund v. Unilab Corp.*, Dkt. No. 99 Civ. 11074(JSM), 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003), citing *Virginia Bankshares*, 501 U.S. at 1093–98, 111 S.Ct. 2749. It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held.

■ In addition, to adequately plead scienter, the plaintiff must allege "an intent to deceive, manipulate or defraud," *Kalnit*, 264 F.3d at 138 (internal quotations omitted), by pointing to specific "facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995). The "strong inference" may be supported either by "(a) . . . facts to show that defendants had both motive and opportunity to commit fraud, or (b) . . . facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.; see also In re WorldCom*, 294 F.Supp.2d at 411–12. Although in the typical case falsity and scienter are different elements, in a false statement of opinion case the two requirements are essentially identical. For example, in a case where a material misstatement of fact is alleged, the statement may be both objectively false *and* believed in good faith by the speaker to be true. However, in contrast, a material misstatement of opinion is by its nature a false statement, not about the objective world, but about the defendant's own belief. Adequately alleging the falsity of a statement like "I believe AWE will grow" is the same as adequately alleging scienter

on the part of the speaker, since the statement (unlike a statement of fact) cannot be false at all unless the speaker is knowingly misstating his truly held opinion. *See DeMarco v. Lehman Bros.*, 309 F.Supp.2d 631, 635 (S.D.N.Y.2004)

■ In their allegations regarding the research reports on AWE, plaintiffs have fallen far short of the standard of particularity imposed by Rule 9(b) and the PSLRA for pleading falsity and scienter. Plaintiffs rest their AWE allegations on three primary legs: (i) that the conflicts of interest and institutional pressures at SSB created motive and incentive for analysts in general to issue falsely positive reports; (ii) that Rollins continued to rate AWE a "Buy" even as the market value of the stock dropped; and (iii) that because Grubman misrepresented his true opinion when issuing research reports on AT & T, it stands to reason that Rollins likewise misrepresented *his* true opinion when issuing research reports on AWE. None of these legs, either separately or together, are sufficient to support a securities fraud claim for false statement of opinion.

■ First, as this Court and others have noted, generalized allegations about conflicts of interest, incentives to increase compensation, or internal pressure on analysts that is not tied to the particular stock at issue are not sufficient, standing alone, to satisfy the particularity requirements. *See Podany v. Robertson Stephens, Inc.*, 318 F.Supp.2d 146, 156 (S.D.N.Y.2004); *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 273 F.Supp.2d 351, 373 (S.D.N.Y.2003) ("the pleading of a motive to issue false statements does not establish that false statements were in fact issued."). Plaintiffs have painted a disturbing picture of the atmosphere at SSB with allegations that, if true, make out a strong case that conflicts of interest there may have provided a mo-

tive for analysts to issue research reports that were more positive than their truly held opinions would dictate: Nothing prevents plaintiffs from eventually introducing, at trial or in a summary judgment motion, evidence supporting these allegations to demonstrate that the AT & T reports issued by Grubman were false.

However, without some facts that indicate that Rollins himself took the bait and issued reports that falsely stated his opinions regarding AWE, or even that the conflicts or institutional pressure described was targeted in some way at Rollins or his AWE coverage (which began after the AWE stock offering), these allegations are simply insufficient to state a claim for securities fraud. Plaintiffs must say what, specifically, was misleading about Rollins's reports. His Buy recommendation could not have been false or misleading unless his actual opinion was otherwise; merely alleging "undisclosed motivations" that *might* lead someone to misrepresent his true opinion does not suffice. *Merrill Lynch*, 273 F.Supp.2d at 372. Plaintiffs' bald conclusory assertion that Rollins did, in fact, misrepresent his true opinion of AWE is likewise insufficient. *See, e.g., San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir.1996). In their opposition brief, plaintiffs point to a Grubman email in November 2000 in which, apparently in response to lawsuits filed by purchasers of the AWE stock offering, Grubman quipped, "I think all legal stuff on AT & T should be forwarded to Sandy and [the head of SSB investment banking] as Exhibit A on why research needs to be left alone. These guys never understand the lingering consequences." (Compl. ¶ 67; P. Mem. 32.) However, contrary to plaintiffs' assertions, this vague reference to "lingering consequences" does nothing to tie Grubman's views, or whatever shenanigans may have resulted in SSB secur-

ing the AWE stock offering deal, to Rollins's coverage of AWE, which did not even begin until after the offering had been completed and AWE was trading freely on the market.

■ Second, plaintiffs' allegations that Rollins's research reports must have misrepresented his true opinion because no rational analyst could have genuinely believed that AWE should be rated a "Buy" throughout the class period likewise do not state a claim for securities fraud. Plaintiffs do not point to any factual error or misrepresentation of objective data in the AWE reports; nor do they dispute that Rollins relied on AWE's publicly available financial information, that he included his financial models and analysis in the reports, and that he tied his analysis to events and announcements that were either publicly announced by AWE or reported in the financial press. Essentially, plaintiffs argue that Rollins's upbeat opinions on AWE must have been false because he remained positive even as the stock continued to decline in value. (*E.g.,* Compl. ¶ 71.) Yet, paradoxically, plaintiffs also point to Rollins's periodic lowering of the "target price" he predicted for AWE as evidence of the fraud. (*Id.,* ¶¶ 84, 93.) It is well-established in the Second Circuit that forward-looking recommendations and opinions are not actionable in securities fraud merely because they are misguided, imprudent or overly optimistic. *See Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir.1999); *Shields v. Citytrust Bancorp Inc.*, 25 F.3d 1124, 1129 (2d Cir.1994).

■ Furthermore, Rollins's statements are protected by the "bespeaks caution" doctrine, which limits fraud liability for forward-looking statements that, while positive, are coupled with sufficient "cautionary language or risk disclosures" that, taken in context, "bespeak caution" to the

reader. *Spencer Trask Software v. RPost Int'l Ltd.*, 02 Civ. 1276(PKL), 2003 WL 169801, at *22 n. 16 (S.D.N.Y. Jan. 24, 2003). Rollins's reports were replete with cautionary language: labelling AWE a "high risk" investment, "suitable for aggressive investors" (July 20, 2001, AWE Report, Rosen Decl. Ex. 9); reminding investors that AWE stock was characterized by "high volatility" (Oct. 22, 2001 AWE Report, Rosen Decl. Ex. 11); noting on multiple occasions that AWE's products and plans, and indeed the entire wireless industry, were untested and that outcomes (and the share price) could be buffeted more severely by macroeconomic factors and other unpredictable external events than would be true for a more established industry (*e.g.*, April 25, 2001, AWE Report, Rosen Decl. Ex. 8; August 17, 2001, AWE Report, Rosen Decl. Ex. 10; January 29, 2002, AWE Report, Rosen Decl. Ex. 12).

▮▮▮ Of course, all the cautionary language in the world does not remove the taint of fraud from statements of opinion that are actually false, or are so divorced from what the speaker knows to be true as to be deliberately misleading. *See In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y.1996) (the "doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.") But where, as here, there are no plausible allegations that the defendants lied about actual facts, only about their opinions, where even the allegations that the opinions were false are unsupported by any specific facts, and where the opinions at issue lay out the pros and cons, with reasonable cautionary language, the argument that Rollins misstated his opinion boils down to the hopelessly expansive claim that investors can sue an analyst because there is some possibility that his "actual" opinion was slightly less pro and more con than what he presented. Under these circumstances, the "bespeaks caution" doctrine provides an appropriate measure of additional protection against "fraud by hindsight" claims such as those leveled against the AWE reports here. *San Leandro*, 75 F.3d at 812.

Third and finally, the allegations related to Grubman's behavior regarding AT & T research reports do not support the inference that Rollins misrepresented his true opinions regarding AWE in the research reports authored by him. Plaintiffs attempt to hitch Rollins to Grubman by implying that Grubman was involved in the wireless analyst group (Compl.¶ 5) and that he was involved in writing or disseminating the AWE reports (*id.* ¶ 70). But Grubman did not write the AWE reports— Rollins did, as is clear from the face of the reports and from the Complaint. (*Id.* ¶ 103.) Moreover, plaintiffs allege no facts showing that Grubman had a supervisory role in relation to Rollins, or even that they ever spoke, much less colluded to disseminate false statements of Rollins's true opinion on AWE. Plaintiffs implicitly acknowledge this gap by not naming Grubman (or Rollins, for that matter) as a defendant on the AWE counts, although he is named individually on the counts related to AT & T. Essentially, plaintiffs' theory is that "liars lie"—that where there is evidence of deceit and dissembling in one part of a company, it is appropriate to expect to find it in other parts, too. But this generalized pall of suspicion is precisely what was rejected by this Court in cases involving *the same analyst*. *See Podany*, 318 F.Supp.2d at 157–58. The theory is all the weaker where plaintiffs are attempting to tar one analyst with the words and behavior of another, where the only factually-supported connection between the two

men is that they worked at the same company in the same division.

Moreover, any theory that Rollins's conduct was of a piece with Grubman's, and can therefore be inferred to be part of a pattern of fraudulent analysis at SSB or Citigroup, is belied by the fact that the behavior of the two men, as alleged in the Complaint, is in fact quite different. The far more detailed allegations about Grubman and his AT & T research reports are designed to support a claim that Grubman, after initially reporting his true negative view of AT & T for years, deliberately falsified his opinion in advance of the early 2000 AWE stock offering, for the specific purpose of furthering a scheme that would bring a particular lucrative investment banking transaction to Citigroup and certain personal benefits to him and to Weill. Under this narrative, Grubman reverted to his true opinion beginning in May 2000, as soon as his goals were accomplished. Rollins's reports, on the other hand, don't even begin until May 2000, when AWE stock is already on the market. Plaintiffs complain that Rollins continued to misrepresent his views until 2002, although plaintiffs point to no specific benefits to either SSB or Rollins personally that might have motivated such a consistent and long-lasting fraud. Evidently, the vague conflicts that plaintiffs contend drove Rollins to falsehood as part of a general culture of fraud at SSB and Citigroup were insufficient to keep Grubman issuing positive reports after the underwriting business was secured.

While the commission of similar fraudulent schemes may be admissible evidence of defendants' state of mind under Federal Rule of Evidence 404(b), alleging the existence of a scheme involving coverage of AT & T does not sufficiently plead that the opinions regarding AWE (provided by a separate analyst and commencing after the relevant events in the alleged AT & T scheme) were fraudulent. The PSLRA requires that each separate instance of fraud be pled with particularity. This accords with common sense and fairness, since otherwise one successfully-alleged misstatement of opinion against a given defendant would permit plaintiffs to allege claims for all similar opinions uttered by that defendant, based on allegations that would otherwise be insufficient as to those particular opinions themselves. This common sense standard is particularly appropriate here, where the only named defendants in the counts involving AWE are SSB (and its corporate successor) and Citigroup. These entities are in the business of publishing opinions about stock purchases, and presumably published opinions about hundreds of different issuers. Arguing that specific allegations of fraud as to any one opinion are legally sufficient under section 10(b) to allege fraud as to *all* opinions published by SSB is, at bottom, no different than plaintiffs' argument that a general atmosphere of conflicts of interest and institutional pressure for optimism is sufficient to state a claim for fraud, which the Court has already rejected. To hold otherwise here would throw open the floodgates to lawsuits regarding all opinions issued by SSB that later proved ill-advised, even in the absence of the particularized allegations of fraud required by Rule 9(b) and the PSLRA.

Plaintiffs have failed to plead with particularity the elements of falsity and scienter necessary to sustain a claim that the research reports on AWE represented false statements of opinion. They have offered no factual allegations that support a "strong inference" that Rollins misrepresented his true opinion of AWE, their hindsight allegations that Rollins was too optimistic in the face of negative facts are not actionable as securities fraud, and their generalized allegations about institu-

tional pressures at SSB or about the behavior of other analysts do not satisfy the demands of particularity for *this* alleged fraud. Accordingly, counts four and five of the Complaint will be dismissed.

### 2. *Causation*

 Defendants argue that the claims regarding AT & T must also be dismissed because plaintiffs have failed to adequately allege loss causation—in other words, have failed to set forth a causal connection that sufficiently links defendants' alleged acts with plaintiffs' losses. (D.Mem. 21–26.) In order to state a claim under section 10(b), the complaint must adequately allege that "plaintiff's reliance on defendant's action caused plaintiff injury." *Press v. Chem. Invest. Services Corp.*, 166 F.3d 529, 534 (2d Cir.1999) (internal quotations omitted). This causation requirement has two elements: "a plaintiff must allege both transaction causation, *i.e.*, that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.*, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir.2001) (emphasis in original). Defendants do not contest, for purposes of this motion, that plaintiffs have adequately pled transaction causation; they argue only that the Complaint fails to allege loss causation.

 The Second Circuit has "likened loss causation to the tort concept of proximate cause, because, similar to proximate cause, in order to establish loss causation, a plaintiff must prove that the damage suffered was a foreseeable consequence of the misrepresentation." *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992); *see also Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198 (2d Cir.2003) (plaintiff must demonstrate that the alleged misrepresentation that caused his purchase also was the cause of his loss; an "allegation of a purchase-time value disparity, standing alone, cannot satisfy this loss causation pleading requirement."). In other words, even if the plaintiff succeeds in demonstrating the existence of a fraud, if the loss was caused by an intervening event not related to the fraud then the section 10(b) claim must fail. *Suez Equity*, 250 F.3d at 96.

Defendants make two primary arguments on loss causation: first, that plaintiffs have only alleged "artificial price inflation," which is insufficient as a matter of law to satisfy the Second Circuit's requirements for loss causation (D.Mem. 21–24); and, second, that because plaintiffs allege that defendants' alleged conflicts of interest were not disclosed until *after* they had sustained their losses, those conflicts could not have been the proximate cause of those losses (D.Mem. 25–26). Both of these arguments depend on oversimplifications and elisions of the Complaint, and are ultimately unpersuasive.

The Courts of Appeals are deeply divided over whether artificial price inflation alone may suffice to allege loss causation, with the Ninth and Eighth Circuits clearly holding that price inflation alone may suffice to state a claim, and the Third and Eleventh Circuits holding that more is required. *Compare Broudo v. Dura Pharmaceuticals, Inc.*, 339 F.3d 933, 938 (9th Cir.2003) ("loss causation does not require pleading a stock price drop following a corrective disclosure or otherwise. It merely requires pleading that the price at the time of purchase was overstated and sufficient identification of the cause."), *and Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 831 (8th Cir.2003) (in a fraud-on-the-market theory case, allegations that defen-

dant's "misrepresentations inflated the stock's price" suffice to plead loss causation), *with Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir.2000) ("an investor must also establish that the alleged misrepresentations proximately caused the decline in the security's value to satisfy the element of loss causation"), *and Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1443 (11th Cir.1997) (a "showing of price inflation, however, does not satisfy the loss causation requirement. Our decisions explicitly require proof of a causal connection between the misrepresentation and the investment's subsequent decline in value.")

██ Although the Second Circuit, in *Emergent Capital*, did not go as far as the Eleventh Circuit in *Robbins*, defendants are correct that, in this Circuit, in the context of misrepresentation cases, mere price inflation, where the ultimate deflation is caused by other factors unrelated to the misrepresentation alleged, cannot satisfy the loss causation requirement. *Emergent Capital*, 343 F.3d at 198; *Merrill Lynch*, 273 F.Supp.2d at 362–63; *see also In re IPO Securities Litig.*, 297 F.Supp.2d 668, 673 (S.D.N.Y.2003). But plaintiffs here do not simply rest on allegations of artificial price inflation as the sole explanation for their claimed losses; in contrast to defendants' characterization, plaintiffs *do* set out a causal chain linking their losses to the alleged fraud. With regard to AT & T, plaintiffs allege specific facts regarding Grubman's influence on the market for telecommunications stocks generally and AT & T in particular (Compl.¶¶ 28–30, 37), Grubman's intentional falsification of his opinion regarding AT & T (*id.* ¶¶ 40–46, 49), the effects on AT & T's market price of the dissemination of this allegedly false opinion (*id.* ¶¶ 47–48, 61), and the subsequent effects on the price of AT & T as Grubman inched back to his allegedly

"true" opinion after the alleged scheme was consummated (*id.* ¶¶ 58–59, 62–66).

██ It is precisely this complete causal chain, both alleging artificial inflation of a stock and linking that inflation to the ultimate decline in the value of plaintiffs' holdings, that distinguishes the complaint in this case from the complaints dismissed in the *Merrill Lynch* cases, and makes it similar to other cases in this district and elsewhere that have denied motions to dismiss complaints that alleged that misrepresentations by analysts manipulated market prices in such a way that those responsible for the misrepresentations can fairly be held liable for plaintiffs' losses. *See DeMarco v. Robertson Stephens*, 318 F.Supp.2d 110 (S.D.N.Y.2004); *Demarco v. Lehman Bros.*, 309 F.Supp.2d at 636; *Bernard v. UBS Warburg LLC*, 03 Civ. 4282(RMB) (S.D.N.Y. September 20, 2004); *WorldCom*, 294 F.Supp.2d 392. Of course, none of this necessarily presages the proof of plaintiffs' allegations at trial or summary judgment—even if their primary allegations as to the fraudulent scheme are borne out, plaintiffs face numerous hurdles to establish the connection between Grubman's statements and the market in AT & T stock, as well as to separate Grubman's influence, if any, from the role that other factors may have played in causing plaintiffs' losses. But such work is not required at the pleading stage, and plaintiffs have satisfied their burden of alleging loss causation at this point in the litigation.

██ Defendants' second argument, regarding the disclosure of conflicts after plaintiffs suffered their losses, deserves only a moment's commentary. This argument is part of a pattern throughout defendants' briefs of pretending that plaintiffs' complaint is merely that SSB made misrepresentations by failing to disclose the compensation schemes and institution-

al pressures that created a conflict of interest and a motive for analysts to misrepresent their true opinions about the stock of companies to whom SSB provided lucrative investment banking expertise. This characterization is a distortion of plaintiffs' actual claim, which is that Grubman intentionally *lied* about his true opinions when he issued research reports for SSB on AT & T, and that these deliberate lies were disseminated with the knowledge and, indeed, encouragement of SSB and Citigroup at the highest levels, up to and including the Chairman of the Board. The Complaint is indeed replete with factual allegations about the conflicts and the compensation and the culture at SSB regarding the relationship between investment banking and research, but these allegations merely explain the motive for the false and misleading statements, the atmosphere in which they occurred, and the culpability of the SSB and Citigroup organization as a whole. The fact that plaintiffs allege that these conflicts were not fully disclosed to the markets until after they suffered their losses, as defendants argue (D.Mem. 25), does not break the causal chain, described above, that forms the core of their claims regarding AT & T and satisfies their burden to plead loss causation with respect to those claims.

### 3. *Pleading Deceit and Manipulation Regarding Weill*

Defendants have also moved to dismiss Count II of the Complaint for failure to adequately allege deceit or manipulation by Weill.[5] Count II alleges that Weill violated section 10(b) and Rule 10b–5(a)

and (c) by engaging in "a scheme and course of misconduct whereby SSB and Grubman issued false and misleading analyst reports regarding AT & T." (Compl.¶ 142.) Rule 10b–5 makes it "unlawful for any person, directly or indirectly, . . . (a) To employ any device, scheme, or artifice to defraud, . . . or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Plaintiffs do not allege that Weill personally made any false statements or omissions, and thus defendants argue that claims against Weill for violations of section 10(b) are nothing more than claims that he aided and abetted a violation of that section by others, which are barred by the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). (D.Mem. 42–43.)

Defendants are correct that *Central Bank* prohibits private suits against aiders and abettors of section 10(b) violations. 511 U.S. at 177, 191, 114 S.Ct. 1439. However, defendants are incorrect that *Central Bank* means that section 10(b) suits cannot be maintained against anyone other than those who personally speak, write or disseminate false or misleading statements. *Compare* 511 U.S. at 189, 114 S.Ct. 1439 (noting primary concern for professionals who merely provide services to potential primary violators) *with* 191 ("secondary actors are [not] always free from liability"). Moreover, plaintiffs here charge Weill with a violation of subsections (a) and (c) of Rule 10b–5, which describe

---

**5.** Weill is also named as a defendant in Count III, for "control person" liability based on the alleged acts of Grubman. Defendants have not moved to dismiss this count on any basis other than those on which they have moved to dismiss the AT & T counts generally (*e.g.* for failure to plead loss causation and for untime-liness). Because the underlying claims involving AT & T will survive the motion to dismiss, and because, for purposes of this motion, defendants have not challenged Weill's "control person" status, Count III against Weill likewise survives.

causes of action for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant. *See Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 152–53, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *SEC v. Zandford,* 535 U.S. 813, 820, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002) ("[N]either the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act.").

The Second Circuit decisions after *Central Bank* have generally applied its holding by dismissing claims against outside professionals who provided necessary services to the fraudsters, but allowing claims to proceed against inside actors who actively participated in or orchestrated the fraudulent scheme alleged, even if they did not personally make the false statements or personally execute the mechanics of the manipulation. *See SEC v. First Jersey Securities,* 101 F.3d 1450 (2d Cir.1996) (allowing primary violation claim against president of brokerage firm who allegedly directed the manipulative acts of multiple branch offices); *Shapiro v. Cantor,* 123 F.3d 717 (2d Cir.1997) (affirming dismissal of claims against outside accounting firm who provided accounting, audit, and financial analysis services in preparation of an allegedly false and misleading offering memorandum; the misrepresentations at issue were unrelated to financial information); *Wright v. Ernst & Young LLP,* 152 F.3d 169 (2d Cir.1998) (affirming dismissal of claims against outside auditing firm for financial misrepresentations in a press release that specifically stated it was "unaudited," although the firm had given private advice to the principal violators); *SEC v. U.S. Environmental, Inc.,* 155 F.3d 107 (2d Cir.1998) (reiterating *First Jersey's* allowance of claims against those who "participated in the fraudulent scheme" and declining to dismiss section 10(b)

claims against a trader who carried out part of the scheme of another defendant by making certain trades). *See also Suez Equity,* 250 F.3d at 101 (noting that *Central Bank* and *Wright* defendants were secondary actors who merely "knew of the purported fraud through transactions with the [other] defendants, but failed to expose the deception," thereby aiding and abetting the fraud designed and carried out by others); *Rich v. Maidstone Financial, Inc.,* 98 Civ. 2569(DAB), 2002 WL 31867724, at *8 n. 6 (S.D.N.Y. Dec. 20, 2002) (cataloguing the "permutations" of the Second Circuit's post-*Central Bank* decisions).

Courts in this district have followed this same pattern: typically dismissing claims brought against outside professionals such as lawyers or accountants, *but see In re Global Crossing Securities Litig.,* 322 F.Supp.2d 319, 330 (S.D.N.Y.2004), and permitting claims against insiders that allege substantial knowing participation or orchestration. *See, e.g., Maidstone Financial,* 2002 WL 31867724, at *8–9 (principal officer of broker-dealer could be sued as primary violator even where an employee had made the charged misrepresentations, because the officer had "substantial participation in" the scheme through his approval and direction of the acts constituting the fraud, and indeed "orchestrated" the scheme); *In re Vivendi Universal Securities Litig.,* 02 Civ. 5571(RJH), 2004 WL 876050, at *9 (S.D.N.Y. April 22, 2004) (adopting the reasoning of Judge Baer in earlier proceedings in the same case, and holding that neither *Central Bank, Shapiro* nor *Wright* "preclude the imposition of primary liability not only on persons who made fraudulent representations but also [on] those who are alleged to have known of the fraud and participated in its perpetration.").

Defendants argue that the claims against Weill are merely disguised claims for aiding and abetting Grubman's alleged misrepresentations. In support of this charge, defendants select a single paragraph from the Complaint (¶ 142) and argue that the statements therein do not allege primary violator liability. (D.Mem. 42.). However, the entire set of relevant allegations, taking all factual allegations as true and drawing all reasonable inferences in plaintiffs' favor, lays out a clear picture of Weill's conduct as a central and knowing participant in, and possible orchestrator of, a scheme to affect the price and position of AT & T stock in the market by issuing false and misleading analyst reports on AT & T, from which he would derive substantial personal benefits in addition to the benefits to SSB and Citigroup from the scheme generally. (*E.g.,* Compl. ¶¶ 37–40, 50, 54–55, 68–69.) This picture contrasts sharply with the outside auditors and other secondary and tertiary actors who have been dismissed from the cases cited by defendants in their brief.

Finally, it perverts the meaning of *Central Bank* to apply its holding to an allegation that a CEO effectively directly ordered a subordinate to issue false and misleading statements on behalf of the firm. True, under criminal law principles, such an actor is characterized as guilty by complicity, as distinct from the primary actor, *see* 18 U.S.C. § 2(a) ("Whoever … aids, abets, counsels, *commands, induces,* or *procures* [a crime] is punishable as a principal."), lending credence to Weill's efforts to cloak himself in *Central Bank's* broad language about aiders and abettors not being subject to the liability that securities laws assign to primary actors. But *Central Bank* rejected the analogy to criminal law principles, urged by the SEC as *amicus curiae,* at least in part because of differences in the state of mind required, rather than differences in actions

taken. *See* 511 U.S. at 190, 114 S.Ct. 1439 (criminal liability requires intentional wrongdoing, but only recklessness was alleged against the defendants). The case here is far from the concerns or the facts of *Central Bank,* which dealt with outside professionals who merely provided assistance to the orchestrators and perpetrators of a fraud, with reckless disregard for the use made of that assistance. It stretches neither the language of Rule 10b–5 nor the holding of *Central Bank* to treat a high-level executive who allegedly orchestrated and directly ordered a false representation as a primary violator along with the underling who actually mouthed or wrote the offending falsehood. Indeed, in *Global Crossing,* this Court found that, in highly unusual circumstances, even an outside professional who allegedly conceived and engineered, rather than merely abetted or turned a blind eye to, a fraudulent scheme could be liable as a primary violator on the same theory. *See* 322 F.Supp.2d at 330.

Of course, these allegations are far from established, and nothing precludes defendants from demonstrating or arguing at some future stage that, as a factual matter, Weill cannot be held liable as a primary violator (or, of course that no scheme existed and no false statements were made). However, defendants have failed to establish that, as a matter of law, the Complaint does not state a claim against Weill for securities fraud. The allegations are adequate for the pleading stage, and this portion of defendants' motion will be denied.

III. *Statute of Limitations*

Finally, defendants argue that plaintiffs' claims should be dismissed as time-barred because plaintiffs "were on notice of the facts underlying their allegations long before the applicable statutes of limitation elapsed." (D.Mem. 11.) As evidence of

notice, defendants cite not only the coverage of Grubman's upgrade and SSB's selection to manage the AWE offering that is mentioned in the Complaint itself (Background, Part IV, *supra* ), but also a slew of similar articles not mentioned in the Complaint. (D.Mem. 12–18.) Defendants also incorporate by reference their discussion in a companion brief in the now-dismissed *RhythmsNet* litigation of the many news articles discussing the general problem of conflicts between investment banking and research on Wall Street. (D. Mem. 18 n. 31.) Finally, defendants point to the filing, in June 2001, of a lawsuit that made some of the same factual allegations, though on a different legal theory, made by plaintiffs here—*Korsinsky v. Salomon Smith Barney*, which was originally filed in state court and removed to this court by defendants, and then dismissed on SLUSA grounds. *See* 01 Civ. 6085(SWK), 2002 WL 27775 (S.D.N.Y. Jan. 10, 2002). Plaintiffs counter that the information contained in these articles and in the *Korsinsky* complaint, particularly when coupled with defendants' emphatic and plausible denials of wrongdoing (including Grubman's sworn testimony before Congress in the summer of 2002), could not have sufficed to apprise plaintiffs of the fraud alleged in their suit. (P. Mem. 11–16.) Plaintiffs argue that they first became aware of the facts necessary to their claims on August 23, 2002, and that the first complaint in this consolidated action was filed just three days later, on August 26, 2002. (*Id.* 15.)

Prior to the enactment of the Sarbanes–Oxley Act on July 30, 2002, the relevant statute of limitations was within three years after the violation alleged and within one year after discovery of the facts constituting the violation; Sarbanes–Oxley

changed both periods, to five years and two years, respectively. 15 U.S.C. § 1658(b). It is immaterial whether the expanded Sarbanes–Oxley limitations period applies in this case, because the AT & T claims in the Complaint are not time-barred even under the former rule that cases must be brought within one year of discovery, which in this case would require that plaintiffs have been on notice of the claims alleged no earlier than August 26, 2001.[6]

The Second Circuit recently summarized the law governing application of the "discovery" limitations period:

> The one-year limitations period begins to run after the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir.1992). Furthermore, "when the circumstances would suggest to an investor of ordinary intelligence the *probability* that she has been defrauded, a duty of inquiry arises." *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir.1993). The circumstances that give rise to a duty of inquiry are often referred to as "storm warnings." *Id.* Once a plaintiff receives these "storm warnings" and a duty of inquiry arises, "knowledge will be imputed to the investor who does not make such an inquiry." *Id.* Moreover, whether the securities fraud claim of a person who receives "storm warnings" is time barred "turns on *when*, after obtaining inquiry notice," the plaintiff "in the exercise of reasonable diligence, should have discovered the facts underlying the [de-

---

**6.** The Court need not consider the timeliness of the AWE claims, as those claims have been dismissed on other grounds.

fendant's] alleged fraud." *Rothman v. Gregor*, 220 F.3d 81, 97 (2d Cir.2000). *Levitt v. Bear, Stearns & Co.*, 340 F.3d 94, 101 (2d Cir.2003) (emphasis added).

Whether a plaintiff "should have" discovered a misrepresentation or omission is an objective determination. *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir.2003); *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983). This question can be resolved at the dismissal stage if "the facts needed ... can be gleaned from the complaint and papers ... integral to the complaint." *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 156 (2d Cir.2003), quoting *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 352 n. 3 (2d Cir.1993). On the other hand, the question of whether a plaintiff exercised due diligence is "usually a question of fact for the jury to decide." *In re Integrated Resources Real Estate Limited Partnerships Securities Litig.*, 815 F.Supp. 620, 638 (S.D.N.Y.1993). To avoid dismissal, plaintiffs must allege facts sufficient to establish that, drawing all reasonable inferences in their favor, they neither discovered nor should have discovered "by the exercise of reasonable diligence" the alleged fraud more than one year before the claims were first asserted. 15 U.S.C. § 77m.

Whether the one-year or two-year discovery period applies, and even assuming for these purposes that it is appropriate to consider the news articles cited by defendants that are not mentioned or relied upon in the Complaint, the claims related to the AT & T research reports are not time-barred. To employ a well-worn but apt cliché, defendants here want to have their cake and eat it too. Defendants have argued, in various places in their briefs on this motion, that allegations of mere conflicts of interest or the motive to misrepresent one's true opinion cannot meet Rule 9(b)'s requirement that fraud be

pled with particularity, and the Court has agreed with this principle. The claims related to the AWE research reports will not survive the motion to dismiss, largely because they fail on this standard. And yet defendants ask to have the claims related to AT & T dismissed as well, based on an argument that media reports of conflicts of interest should have put the plaintiffs here on inquiry notice of the fraud alleged—which, contrary to defendants' characterization, is not that there were conflicts of interest at SSB that may have induced Grubman to puff up or moderate his true opinion, but rather that he intentionally *lied* about his true opinions when he issued research reports for SSB on AT & T, and that these deliberate lies were disseminated with the knowledge and, indeed, encouragement of his employers, both institutionally and by senior executives at the very highest levels.

Plaintiffs have adequately alleged, and have persuasively argued in their brief, that they could not have discovered the factual allegations underlying their claims prior to the release of information about the New York Attorney General's investigation into SSB, which revealed the content of the emails and internal memos relied upon in the Complaint. Even if many of the articles cited by defendants should have raised an eyebrow about the goings-on regarding Grubman's coverage of AT & T, the defendants' vigorous contemporaneous denials (issued both by Grubman and by Weill as Chairman of a major financial firm) of any wrongdoing or conflict, combined with the lack of access to any discovery mechanism for SSB internal documents, would have made any attempt at further inquiry by private defendants futile. And if plaintiffs had ignored the denials issued by Grubman and Weill and filed a complaint that alleged securities fraud, basing those claims only on

allegations of conflicts of interest as SSB and the media speculation regarding the convenient timing of Grubman's upgrade and SSB's selection to lead the AWE stock offering, that complaint likely would have been dismissed for failure to state a claim, much as the AWE claims here, and the other claims related to analyst conflicts, have been dismissed in this district. *See, e.g., Podany,* 318 F.Supp.2d at 158; *Merrill Lynch,* 273 F.Supp.2d at 355. *Cf. Demarco v. Lehman Bros.,* 309 F.Supp.2d at 636–37; *WorldCom,* 2003 WL 22790942, at *5–6 (denying motion to dismiss claims against SSB and Grubman on similar evidence of press reports of conflicts and cozy relationships, contrasted with defendants' contemporaneous denials of wrongdoing and later discovery of specific facts underlying allegations).

While press reports or other public discussion need not spell out every detail of a fraud in order to put plaintiffs on inquiry notice, they must be sufficiently detailed to make the existence of a fraud *probable* to an ordinary investor. *Newman,* 335 F.3d at 194. Given the nature of the fraud alleged here—deliberate and knowing false statements of opinion by an influential industry analyst, disseminated with the knowledge, encouragement and participation of his employers, including the most senior management of the company, and motivated by an elaborate three-way scheme for both personal and corporate enrichment and benefit—the articles cited by defendants are simply too vague to sustain the claim that, as a matter of law at the pleading stage, these plaintiffs were on notice of these claims before August 23, 2002. As the first complaint was filed on August 26, 2002, the claims related to AT & T are not subject to dismissal for untimeliness.

## CONCLUSION

For the reasons discussed above, the defendants' motion to dismiss is granted in part and denied in part. Counts four and five, related to AWE research reports, are dismissed for failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). The remaining counts, related to AT & T research reports, survive as to all defendants. Counsel are directed to appear before the Court for a conference to set a discovery schedule on December 17, 2004, at 10:00 a.m.

SO ORDERED.